## BOLT v CITY OF LANSING

Docket No. 108511. Argued October 6, 1998 (Calendar No. 4). Decided December 28, 1998. Rehearing denied *post*, 1234.

Alexander Bolt, as a city of Lansing taxpayer, brought an action in the Court of Appeals pursuant to Const 1963, art 9, § 32 (the Headlee Amendment) against the city of Lansing, alleging that a storm water service charge imposed by Lansing Ordinance No. 925 violates Const 1963, art 9, §§ 25 and 31 in that it is a tax that was not submitted to a vote of the people. The Court of Appeals, SAAD, P.J., and WAHLS, J. (MARKMAN, J., dissenting), concluded that the charge did not violate the Headlee Amendment because it is a valid user fee. 221 Mich App 79 (1997) (Docket No. 192944). The plaintiff appeals.

In an opinion by Justice WEAVER, joined by Justices BRICKLEY, KELLY, and TAYLOR, the Supreme Court *held*:

The storm water service charge imposed by city of Lansing Ordinance No. 925 is unconstitutional, and thus void. It is a tax, and not a valid user fee, for which approval is required by a vote of the people.

1. Three primary criteria are to be considered when distinguishing between a fee and a tax: a user fee must serve a regulatory purpose rather than a revenue-raising purpose; user fees must be proportionate to the necessary costs of the service; a user fee must be voluntary—property owners must be able to refuse or limit their use of the commodity or service. The storm water service charge fails to satisfy the first and second criteria.

2. Approximately seventy-five percent of the property owners in the city already are served by a separated storm and sanitary sewer system, and many have paid for this separation through special assessments. The charge under Ordinance 925 applies to all property owners, rather than only to those who actually benefit. A true fee, however, is not designed to confer benefits on the general public, but rather to benefit the particular person on whom it is imposed. The lack of correspondence between the charges and the benefit conferred demonstrates that the city failed to differentiate any particularized benefits to property owners from the general benefits conferred on the public.

3. The ordinance lacks a significant element of regulation. It only regulates the amount of rainfall shed from a parcel of property as surface runoff; it does not consider the presence of pollutants on each parcel that contaminate such runoff and contribute to the need for treatment before discharge into navigable waters. Additionally, the ordinance fails to distinguish between those responsible for greater and lesser levels of runoff and excludes street rights of way from the properties covered by the ordinance. Moreover, there is no end-of-pipe treatment for the storm water runoff. Rather, the storm water is discharged into the river untreated.

4. Ordinance 925 also fails to satisfy the third criterion, voluntariness, because the charge lacks any element of volition. The charge is effectively compulsory. It replaces the portion of the combined sewer overflow program that was previously funded by general fund revenues from property and income taxes, the service charge may be secured by placing a lien on property, the charge is billed through the city assessor's office, and the bill may be sent with the December property tax statements.

Reversed and remanded.

Justice BOYLE, joined by Chief Justice MALLETT, and Justice CAVANAGH, dissenting, stated that, because the storm water disposal system benefits every landowner who uses it and Lansing Ordinance No. 925 reasonably calculates the storm water service charge on the basis of each landowner's use, the ordinance imposes a fee, not a tax, on Lansing residents.

Two factors to be considered in determining whether an exaction imposes a fee are the proportionality and reasonableness of the fee to the benefit conferred and the purpose of the regulation, i.e., is its purpose to charge the user and not simply to raise revenue. A fee generally is exchanged for a service rendered or a benefit conferred, and some reasonable relationship must exist between the amount of the fee and the value of the service or benefit. Under Ordinance No. 925, the overall system will benefit each landowner who uses it by increasing property values. Although the ordinance uses the term flat rate, it does not impose a universal charge on all properties in the city. Rather, it imposes a fee structure based entirely upon the amount of storm water runoff by establishing a system for computing annual bills on the basis of parcel size, pervious/impervious area, and parcel development. The city used a logical system to compute the proportionate amount of runoff that each parcel contributes to the overall system, and the dissent's analysis of the ordinance reveals that the charges are fair and reasonable and bear a substantial relationship to the cost of the services and the facilities.

*Honigman, Miller, Schwartz & Cohn* (by *Frederick M. Baker, Jr.*), and *Witzel & Zoeller, P.C.* (by *Jeffrey Zoeller*), for the plaintiff-appellant.

*James D. Smiertka,* City Attorney, and *Jack C. Jordan,* Chief Deputy City Attorney, for the defendant-appellee.

Amici Curiae:

*R. Bruce Laidlaw* and *Abigail Elias* for Michigan Municipal League and City of Ann Arbor.

*Dykema, Gossett, P.L.L.C.* (by *Stewart L. Mandell* and *Angela R. White*), for Lansing Regional Chamber of Commerce.

*William R. Wingard* for Citizens to Abolish the Rain Tax Ordinance.

WEAVER, J. We granted leave to appeal in this case to determine whether the storm water service charge imposed by Lansing Ordinance No. 925 is a valid user fee or a tax that violates the Headlee Amendment, Const 1963, art 9, § 31.[1] We hold that the storm water service charge is a tax, for which approval is required by a vote of the people. Because Lansing did not submit Ordinance 925 to a vote of the people as required by the Headlee Amendment, the storm water service charge is unconstitutional and, therefore, null and void.

I

Part of the Lansing wastewater disposal system combines sanitary and storm sewers. During periods of heavy precipitation, the combined system often

---

[1] 456 Mich 949 (1998).

overflows, discharging combined storm water and untreated or partially treated sewage into the Grand and Red Cedar Rivers. In an effort to comply with the Clean Water Act (CWA) and the National Pollutant Discharge Elimination Standards (NPDES) permit-program requirement to control combined sewer overflows,[2] the city of Lansing elected to separate the remaining combined sanitary and storm sewers.[3]

The estimated cost of implementing the combined sewer overflow (CSO) control program is $176 million over the next thirty years. In 1995, as a means of funding the separation, the Lansing City Council adopted Ordinance 925, which provides for the creation of a storm water enterprise fund "to help defray the cost of the administration, operation, maintenance, and construction of the stormwater system . . . ."[4] The ordinance provides that costs for the storm water share of the CSO program (fifty percent of total CSO costs, including administration, construction, and engineering costs) will be financed through an annual storm water service charge. This charge is imposed on each parcel of real property located in the city using a formula that attempts to roughly estimate each parcel's storm water runoff.

Estimated storm water runoff is calculated in terms of equivalent hydraulic area (EHA). As defined by the ordinance, EHA is "based upon the amount of pervious and impervious areas within the parcel multiplied by

---

[2] The CWA allows cities to obtain permits to discharge specified levels of pollutants into navigable waterways.

[3] Approximately seventy-five percent of the property owners are already served by a separated storm and sanitary sewer system.

[4] The fund replaced that portion of the system that was previously funded by general fund revenues secured through property and income taxes.

the runoff factors applicable to each." Impervious land area, which impedes water absorption, thus increasing storm water runoff, is defined as

> [t]he surface area within a parcel that is covered by any material which retards or prevents the entry of water into the soil. Impervious land area includes, but is not limited to, surface areas covered by buildings, porches, patios, parking lots, driveways, walkways and other structures. Generally, all non-vegetative land areas shall be considered impervious.

Pervious land area is defined as "[a]ll surface area within a parcel which is not impervious . . ."

Residential parcels measuring two acres or less are not assessed charges on the basis of individual measurements, but, rather, are charged pursuant to flat rates set forth in the ordinance.[5] These rates are based on a predetermined number of EHA units per one thousand square feet.[6] For residential parcels over two acres, commercial parcels, and industrial parcels, the EHA for an individual parcel is calculated by multiplying the parcel's impervious area by a run-

---

[5] Residential property is defined under the ordinance as "[t]hose platted or unplatted parcels, either public or private, with or without buildings, and located within the city of Lansing, and those parcels which are used for, or probably will be used for residential purposes."

[6] Under the ordinance, the annual flat rates applied to residential parcels measuring less than two acres are as follows:

| PARCEL SIZE | DEVELOPED PARCEL | UNDEVELOPED PARCEL |
|---|---|---|
| | * * * | |
| 3,500 | $ 35.95 | $ 7.34 |
| 3,500-7,000 | $ 59.83 | $18.43 |
| 7,000-10,500 | $ 84.60 | $31.06 |
| 10,500-2 acres | $120.17 | $88.20 |

off factor of 0.95 and pervious area by a runoff factor
of 0.15 and adding the two areas.[7]

Charges not paid by the deadline are considered
delinquent and subject to delayed payment charges,
rebilling charges, property liens (if the charge
remains unpaid for six months or more), and attorney
fees if a civil suit is filed to collect delinquent
charges. The ordinance further provides for a system
of administrative appeals by property owners con-
tending that their properties have been unfairly
assessed. In April 1996, the director of public service
promulgated amended administrative rules that pro-
vide a twenty-five percent credit for properties with
no storm water system service and a fifty percent
credit for properties with neither storm nor sanitary
sewer service.[8]

---

[7] Industrial property is defined as "[t]hose platted or unplatted parcels
used for manufacturing and processing purposes with or without build-
ings; those parcels used for utilities sites for generating plants, pumping
stations, switches, substations, compressing stations, warehouses and
right of way, flowage land and storage areas; and those parcels used for
removal or processing of gravel, stone, or mineral ores, whether valued by
the local assessor or by the state geologist." Commercial property is
defined as "[t]hose platted or unplatted parcels used for commercial pur-
poses, whether wholesale, retail, or service, with or without buildings;
those parcels used by fraternal societies; those used for religious or gov-
ernmental purposes; schools; colleges; and those parcels used as golf
courses, boat clubs, ski areas, or apartment buildings with more than 4
units."

[8] At some point, it appears that the rules issued by the public service
director were amended to include a one hundred percent credit. The most
recent version of the rules regarding detention credits, which reflects a
revision date of March 3, 1998, provides for a twenty-five percent credit
to appealed properties "which do not front a curb and guttered street and
whose stormwater run-off did not reach a; [sic] storm sewer, drainage
ditch, or stream, directly or by sheet flow through adjacent properties."
The rules provide a fifty percent credit to appealed properties "satisfying
the criteria for a 25% credit, and who's's [sic] residence was not connected
to the City's sanitary sewer system." The rules award one hundred percent
credit to appealed properties satisfying the criteria for twenty-five percent

The city began billing property owners for the storm water service charge in December 1995, with payment being due on March 15, 1996. Plaintiff was billed $59.83 for his 5,400 square-foot parcel. On March 4, 1996, plaintiff filed his complaint, alleging that Ordinance 925 violates Const 1963, art 9, §§ 25 and 31 (the Headlee Amendment).[9] The Court of Appeals, in a two-to-one decision, concluded that the storm water service charge did not violate the Headlee Amendment because it constituted a valid user fee.[10]

II

Whether the storm water service charge imposed by Ordinance 925 is a "tax" or a "user fee" is a question of law that this Court reviews de novo. *Saginaw Co v John Sexton Corp of Michigan*, 232 Mich App 202, 209; 591 NW2d 52 (1998). If, as plaintiff contends, the charge is a tax, it unquestionably violates the Headlee Amendment, Const 1963, art 9, § 31, which provides in relevant part:

---

credit and located "within a drainage district which could not be served by an existing public storm sewer outlet." It also appears that credits were established through the Lansing City Council Appeal Review, which awards a twenty-five percent credit "to any property fronting a non-curb and guttered street which did not have any storm sewer on their block" and one hundred percent credit to "any property which fronts a gravel street and does not have a catch basin directly in front of their property or does not have a storm sewer in their block" and to "a property with no street frontage with no adjacent property fronting a street with storm sewer in that block."

[9] Plaintiff filed his action in the Court of Appeals pursuant to Const 1963, art 9, § 32, which provides in pertinent part that "[a]ny taxpayer of the state shall have standing to bring suit in the Michigan State Court of Appeals to enforce the provisions of Sections 25 through 31, inclusive, of this Article . . . ."

[10] 221 Mich App 79; 561 NW2d 423 (1997).

Units of Local Government are hereby prohibited from levying any tax not authorized by law or charter when this section is ratified or from increasing the rate of an existing tax above that rate authorized by law or charter when this section is ratified, without the approval of a majority of the qualified electors of that unit of Local Government voting thereon.

However, if the charge is a user fee, as the city maintains, the charge is not affected by the Headlee Amendment.

The Court of Appeals majority ruled that the storm water service charge was a valid user fee. In so holding, the Court analogized to the case of *Ripperger v Grand Rapids*, 338 Mich 682, 686-687; 62 NW2d 585 (1954), in which this Court concluded that sewage disposal charges to landowners were not a tax.[11] The Court of Appeals stated:

From this analysis in *Ripperger*, we conclude that, here, charges for storm water collection, detention, and treatment (which even plaintiff concedes was properly subject to a fee and not a tax when combined with sewage disposal) do not lose their character as a fee by virtue of being separated from sewage collection and disposal. Therefore, for the reasons stated in *Ripperger*, we hold that the result does not change by separating the systems—the charge here is a user fee, not a tax. [221 Mich App 79, 87; 561 NW2d 423 (1997).]

---

[11] In *Ripperger*, a pre-Headlee case, the sewer service charge was based on the metered water usage for the winter quarter. In determining that the sewer charge was not a tax, the *Ripperger* Court concluded with very little analysis that the same reasoning that treated water rates paid by consumers as the price paid for a commodity applied equally to the sewage charges imposed by the city of Grand Rapids. *Ripperger, supra* at 685-686.

There is no bright-line test for distinguishing between a valid user fee and a tax that violates the Headlee Amendment. As noted by the Court of Appeals, the difficulty in resolving the issue is that the Headlee Amendment fails to define either the term "tax" or "fee," an omission that the Headlee Blue Ribbon Commission urged the Legislature to rectify. Headlee Blue Ribbon Commission, A Report to Governor John Engler, Executive Summary, and § 5, pp 26-31 (September 1994). A primary rule in interpreting a, constitutional provision such as the Headlee Amendment is the rule of "common understanding":

> "A constitution is made for the people and by the people. *The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it.* 'For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, *the intent to be arrived at is that of the people,* and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, *but rather that they have accepted them in the sense most obvious to the common understanding,* and ratified the instrument in the belief that that was the sense designed to be conveyed.' " [*Traverse City School Dist v Attorney General,* 384 Mich 390, 405; 185 NW2d 9 (1971), quoting Cooley's Const Lim 81 (emphasis in original).]

In addition, to clarify meaning, the courts may consider the circumstances leading to the adoption of the constitutional provision and the purpose sought to be accomplished. *Id.*

The Headlee Amendment "grew out of the spirit of 'tax revolt' and was designed to place specific limitations on state and local revenues. The ultimate purpose was to place public spending under direct control." *Waterford School Dist v State Bd of Ed,* 98 Mich

App 658, 663; 296 NW2d 328 (1980). More recently, this Court has stated,

> The Headlee Amendment was "part of a nationwide 'tax-payers revolt' . . . to limit legislative expansion of requirements placed on local government, to put a freeze on what they perceived was excessive government spending, and to lower their taxes both at the local and the state level." [*Airlines Parking, Inc v Wayne Co*, 452 Mich 527, 532; 550 NW2d 490 (1996).]

Determining whether the storm water service charge is properly characterized as a fee or a tax involves consideration of several factors. Generally, a "fee" is "exchanged for a service rendered or a benefit conferred, and some reasonable relationship exists between the amount of the fee and the value of the service or benefit." *Saginaw Co, supra* at 210; *Vernor v Secretary of State*, 179 Mich 157, 164, 167-169; 146 NW 338 (1914). A "tax," on the other hand, is designed to raise revenue. *Bray v Dep't of State*, 418 Mich 149, 162; 341 NW2d 92 (1983).

> "Exactions which are imposed primarily for public rather than private purposes are taxes. Revenue from taxes, therefore, must inure to the benefit of all, as opposed to exactions from a few for benefits that will inure to the persons or group assessed." [Citations omitted.]

In resolving this issue, this Court has articulated three primary criteria to be considered when distinguishing between a fee and a tax. The first criterion is that a user fee must serve a regulatory purpose rather than a revenue-raising purpose. *Merrelli v St Clair Shores*, 355 Mich 575, 583-584; 96 NW2d 144 (1959), quoting *Vernor, supra* at 167-170. A second, and related, criterion is that user fees must be proportion-

ate to the necessary costs of the service. *Id.*; *Bray*, *supra* at 160. As was summarized in *Vernor*, ·

> To be sustained [as a regulatory fee], the act we are here considering must be held to be one for regulation only, and not as a means primarily of producing revenue. Such a measure will be upheld by the courts when plainly intended as a police regulation, and the revenue derived therefrom is not disproportionate to the cost of issuing the license, and the regulation of the business to which it applies. [*Id.* at 167.]

In *Ripperger*, this Court articulated a third criterion: voluntariness. Quoting from *Jones v Detroit Water Comm'rs*, 34 Mich 273, 275 (1876), the *Ripperger* Court stated:

> "The water rates paid by consumers are in no sense taxes, but are nothing more than the price paid for water as a commodity, just as similar rates are payable to gas companies, or to private water works, for their supply of gas or water. No one can be compelled to take water unless he chooses, and the lien, although enforced in the same way as a lien for taxes, is really a lien for an indebtedness, like that enforced on mechanics' contracts, or against ships and vessels. The price of water is left to be fixed by the board in their discretion, and the citizens may take it or not as the price does or does not suit them."
>
> We believe the same reasoning that was applied to water charges in the above-mentioned case should be applied to sewage charges in the present case. [*Id.* at 686.]

Thus, one of the distinguishing factors in *Ripperger* was that the property owners were able to refuse or limit their use of the commodity or service.[12]

---

[12] The *Ripperger* Court also noted that the amount paid reflected the price of the service received, thus reiterating the second criterion that the fee must be proportionate to the cost of the service. Accordingly, rather than standing for the proposition that sewage charges are always user

In instituting the storm water service charge, the city of Lansing has sought to fund fifty percent of the $176 million dollar cost of implementing the CSO control program over the next thirty years. A major portion of this cost (approximately sixty-three percent) constitutes capital expenditures.[13] This constitutes an investment in infrastructure as opposed to a fee designed simply to defray the costs of a regulatory activity.[14] Consequently, the ordinance fails both the first and second criteria. We find the analysis of the dissenting Court of Appeals judge on this point persuasive:

> [N]o effort has been made to allocate even that portion of the capital costs that will have a useful life in excess of

fees, as the Court of Appeals majority contended, 221 Mich App 86-87, *Ripperger* actually articulated relevant criteria for determining whether a charge is a fee or a tax.

[13] The total estimated cost through the year 2038 is $205,523,226. Of that total, $8,600,000 is for capital improvement project/separated sewer costs, $85,991,953 is for storm CSO costs through 2018 (i.e., fifty percent of the total CSO control program costs), and $34,679,234 is for storm NPDES permitting costs. Adding these three components together, $129,271,187, or 62.89 percent of the costs incurred, are for what can be termed capital improvements. Approximately ten percent of the total cost, or $20,567,039, is allocated to administration and billing costs. Operation and maintenance costs are forecasted at $55,685,000. Table 1, Stormwater Utility Ad Hoc Committee Report (August, 1995).

[14] The dissent makes much of the fact that the ordinance does not raise revenue for the general revenue fund. However, this does not preclude us from determining that the purpose of the storm water charge is to generate revenue. "[W]here revenue generated by a regulatory 'fee' exceeds the cost of regulation, the 'fee' is actually a tax in disguise." *Gorney v Madison Heights*, 211 Mich App 265, 268; 535 NW2d 263 (1995). Additionally, the dissent would conclude that the user fee is proportionate to the costs of the service because the EHA method used to compute the charge is "a logical system" that estimates "the proportionate amount of runoff" that each parcel contributes. However, this argument fails to address the fact that a major portion of the costs constitutes capital expenditures and, consequently, an investment in infrastructure that will serve the city for many years after property owners have paid for it.

thirty years to the general fund. This is an investment in infrastructure that will substantially outlast the current "mortgage" that the storm water charge requires property owners to amortize. At the end of thirty years, property owners will have fully paid for a tangible asset that will serve the city for many years thereafter. Accordingly, the "fee" is not structured to simply defray the costs of a "regulatory" activity, but rather to fund a public improvement designed to provide a long-term benefit to the city and all its citizens. The revenue to be derived from the charge is clearly in excess of the direct and indirect costs of actually using the storm water system over the next thirty years and, being thus disproportionate to the costs of the services provided and the benefits rendered, constitutes a tax. See *Merrelli v St Clair Shores*, 355 Mich 575, 585-588; 96 NW2d 144 (1959).

I do not believe that the capital investment component of a true fee may be designed to amortize such an expense, and to enable the city to fully recoup its investment, in a period significantly shorter than the actual useful service life of the particular public improvement. This fundamental principle of basic accountancy guides public utility regulators, *Ass'n of Businesses Advocating Tariff Equity v Public Service Comm*, 208 Mich App 248, 261; 527 NW2d 533 (1994) ("[c]onceptually, ratepayers are charged for the amortization expense when it occurs and, therefore, rates coincide with the expense and are not retroactive"), as well as tax assessors, *Consumers Power Co v Big Prairie Twp*, 81 Mich App 120, 133-135; 265 NW2d 182 (1978). It ought to apply equally here.

This is not to say that a city can never implement a storm water or sewer charge without running afoul of art 9, § 31. A proper fee must reflect the bestowal of a corresponding benefit on the person paying the charge, which benefit is not generally shared by other members of society. *Nat'l Cable Television Ass'n v United States & Federal Communications Comm*, 415 US 336, 340-342; 94 S Ct 1146; 39 L Ed 2d 370 (1974). Where the charge for either storm or sanitary sewers reflects the actual costs of use, metered with relative precision in accordance with available technology,

including some capital investment component, sewerage may properly be viewed as a utility service for which usage-based charges are permissible, and not as a disguised tax. See *Ripperger v Grand Rapids*, 338 Mich 682, 686-687; 62 NW2d 585 (1954). [221 Mich App 91-92.]

Two related failings of the ordinance support our conclusion that the storm water service charge fails to satisfy the first and second criteria. First, the charges imposed do not correspond to the benefits conferred. Approximately seventy-five percent of the property owners in the city are already served by a separated storm and sanitary sewer system. In fact, many of them have paid for such separation through special assessments. Under the ordinance, these property owners are charged the same amount for storm water service as the twenty-five percent of the property owners who will enjoy the full benefits of the new construction.[15] Moreover, the charge applies to all property owners, rather than only to those who actually benefit. A true "fee," however, is not designed to confer benefits on the general public, but rather to benefit the particular person on whom it is imposed. *Bray, supra* at 162; *Nat'l Cable Television Ass'n, supra* at 340-342.

The distinction between a fee and a tax is one that is not always observed with nicety in judicial decisions, but according to some authorities, any payment exacted by the

---

[15] The appeal process and available credits do not make the charge proportionate to the necessary costs of the service because there is no credit for the seventy-five percent of the property owners who are already served by a separated sewer system. As explained during oral arguments, if the appeals process were to credit the seventy-five percent already served by a separated system, it would eviscerate the purpose of the ordinance. Thus, this appeal process, however structured, simply cannot save the ordinance from violating the Headlee Amendment.

state or its municipal subdivisions as a contribution toward
the cost of maintaining governmental functions, where the
special benefits derived from their performance is merged
in the general benefit, is a tax. [71 Am Jur 2d, State and
Local Taxation, § 15, p 352.]

In this case, the lack of correspondence between the
charges and the benefit conferred demonstrates that
the city has failed to differentiate any particularized
benefits to property owners from the general benefits
conferred on the public.

This conclusion is buttressed by the fact that the
acknowledged goal of the ordinance is to address
environmental concerns regarding water quality.
Improved water quality in the Grand and Red Cedar
Rivers and the avoidance of federal penalties for dis-
charge violations are goals that benefit everyone in
the city, not only property owners. As stated by the
Court of Appeals dissent,

The extent of any particularized benefit to property own-
ers is considerably outweighed by the general benefit to the
citizenry of Lansing as a whole in the form of enhanced
environmental quality. . . . When virtually every person in a
community is a "user" of a public improvement, a municipal
government's tactic of augmenting its budget by purporting
to charge a "fee" for the "service" rendered should be seen
for what it is: a subterfuge to evade constitutional limita-
tions on its power to raise taxes. [221 Mich App 96.]

The second failing that supports the conclusion
that the ordinance fails to satisfy the first two criteria
is the lack of a significant element of regulation. See
*Bray, supra* at 161-162; *Vernor, supra* at 167-169. The
ordinance only regulates the amount of rainfall shed
from a parcel of property as surface runoff; it does
not consider the presence of pollutants on each par-

cel that contaminate such runoff and contribute to the need for treatment before discharge into navigable waters. Additionally, the ordinance fails to distinguish between those responsible for greater and lesser levels of runoff and excludes street rights of way from the properties covered by the ordinance. Moreover, there is no end-of-pipe treatment for the storm water runoff. Rather, the storm water is discharged into the river untreated.

Ordinance 925 also fails to satisfy the third criterion—voluntariness—because the charge lacks any element of volition. One of the distinguishing factors of a tax is that it is compulsory by law, "whereas payments of user fees are only compulsory for those who use the service, have the ability to choose how much of the service to use, and whether to use it at all." Headlee Blue Ribbon Commission Report, *supra*, § 5, p 29.[16] The charge in the present case is effectively compulsory. The property owner has no choice

---

[16] The dissent disputes that voluntariness is a factor to consider in determining whether the charge is a fee or a tax. The dissent cites *Cincinnati v United States*, 153 F3d 1375, 1378 (Fed, 1998), to support its argument that a municipal assessment is not an impermissible tax simply because it is involuntarily imposed. First, we would note that the criteria we have articulated are not to be considered in isolation. The lack of volition in this case is one of several factors supporting our conclusion that the storm water charge is a tax. Second, we would note that the court in *Cincinnati* declined to answer the question when an involuntarily imposed assessment might be a permissible fee. *Id.*

Further, we note that the Headlee Blue Ribbon Commission's definition of user fee, which the dissent quotes in footnote 14 to support its argument that the storm water charge in this case should be classified as a user fee, explicitly mentions voluntariness:

A "fee for service" or "user fee" is a payment made for the *voluntary receipt* of a measured service, in which the revenue from the fees are used only for the service provided. [Headlee Blue Ribbon Commission Report, *supra*, § 5, p 30 (emphasis added).]

whether to use the service and is unable to control the extent to which the service is used. The dissent suggests that property owners can control the amount of the fee they pay by building less on their property. However, we do not find that this is a legitimate method for controlling the amount of the fee because it is tantamount to requiring property owners to relinquish their rights of ownership to their property by declining to build on the property.

Additional factors, while not dispositive, also support the conclusion that the storm water charge in this case is a tax. First, for purposes of the storm water share of the CSO control program, the "storm water enterprise fund" replaces the portion of the program that was previously funded by the general fund revenues from property and income taxes.[17] Second, the fact that the storm water service charge may be secured by placing a lien on property is relevant. While ordinarily the fact that a lien may be imposed does not transform an otherwise proper fee into a tax,[18] this fact buttresses the conclusion that the charge is a tax in the present case, where the charges imposed are disproportionate to the costs of operating the system and to the value of the benefit conferred, and the charge lacks an element of volition. Moreover, although allegedly chosen because it was the most cost-effective method of billing, we think it

---

[17] In response to this conclusion, the dissent notes that the Revenue Bond Act permits the city to implement a sewer system. However, whether the city was authorized under the Revenue Bond Act to implement a sewer system is not at issue in the present case. What is at issue is how that system is to be funded. It stands to reason that even though the city may be authorized to implement the system, its method of funding the system may not violate the Headlee Amendment.

[18] See *Jones, supra* at 275.

significant that the storm water charge is billed through the city assessor's office and that the bill may be sent with the December property tax statements.

### III. CONCLUSION

We conclude that the storm water service charge imposed by Ordinance 925 is a tax and not a valid user fee. To conclude otherwise would permit municipalities to supplement existing revenues by redefining various government activities as "services" and enacting a myriad of "fees" for those services. To permit such a course of action would effectively abrogate the constitutional limitations on taxation and public spending imposed by the Headlee Amendment, a constitutional provision ratified by the people of this state. In fact, the imposition of mandatory "user fees" by local units of government has been characterized as one of the most frequent abridgments "of the spirit, if not the letter," of the amendment.

> The danger to the taxpayer of this burgeoning phenomenon [the imposition of mandatory user fees] is as clear as are its attractions to local units of government. The "mandatory user fee" has all the compulsory attributes of a tax, in that it must be paid by law without regard to the usage of a service, and becomes a tax lien of the property. However, it escapes the constitutional protections afforded voters for taxes. It can be increased any time, without limit. This is precisely the sort of abuse from which the Headlee Amendment was intended to protect taxpayers. [Headlee Blue Ribbon Commission Report, *supra*, § 5, pp 26-27.]

Therefore, we reverse the decision of the Court of Appeals and remand this case to that Court for further proceedings consistent with this opinion.

BRICKLEY, KELLY, and TAYLOR, JJ., concurred with WEAVER, J.

BOYLE, J. (*dissenting*). In its opinion today, the majority holds that the Lansing "storm water service charge is a tax, for which approval is required by a vote of the people," *ante* at 154. I respectfully dissent. Because the storm water disposal system benefits every landowner who uses the system and the Lansing ordinance reasonably calculates the fee on the basis of each landowner's use, I find that the ordinance imposes a fee, not a tax, on Lansing residents. I would affirm the decision of the Court of Appeals.

I

A rather complex procedural quagmire spawned this case. Section 301 of the Federal Water Pollution Control Act, commonly known as the "Clean Water Act" (CWA), prohibits the discharge of any pollutant by any person, including municipalities, into navigable waters of the United States and mandates compliance with water quality standards. 33 USC 1311, 1362. A person or municipality responsible for a discharge of pollutants into any waters of the United States from a point source is subject to the CWA, which prohibits any discharge into United States waters without a permit. In order to avoid sanctions for discharging the pollutants, a discharger must obtain and comply with a permit under the National Pollutant Discharge Elimination Standards (NPDES) program. 33 USC 1342. Any discharge of pollutants without a permit or in violation of a permit's conditions is subject to federal civil and criminal penalties and citizen suits.

The Michigan Department of Environmental Quality (DEQ), formerly the Michigan Department of Natural Resources (DNR), administers the NPDES permit program established under the Federal Water Pollution Control Act. As a discharger of pollutants, the city of Lansing previously had to obtain a NPDES permit.[1]

---

[1] In 1977, the DNR (now the DEQ) issued the city of Lansing's first NPDES permit, but required the city to submit a facilities plan by June 30, 1978, to the DNR Water Resource Commission (WRC) to implement a combined sewer overflow (CSO) control program. On September 27, 1978, the WRC issued to the city a notice of noncompliance and order to comply for failing to submit a complete facilities plan that would address combined sewer overflows by the June 30, 1978, deadline. On May 10, 1979, the DNR agreed to draft a NPDES permit that included submission dates for the city's final facilities plan, and on June 25, 1979, the city submitted its draft of the facilities plan to the DNR for review and comment.

On August 1, 1979, the DNR-WRC issued a notice of violation and order to comply. Further, the DNR-WRC issued a citation to the city for failure to control its combined sewer overflows and submit its facilities plan addressing the combined sewer overflows by June 30, 1978. In conjunction with this notice, the DNR issued a notice of intent to place a moratorium on sewer construction permits within the city.

In response, the Lansing City Council passed a resolution calling for public hearing on the draft facilities plan, and in December, 1979, gave notice of public hearing. Finally, on January 21, 1980, the Lansing City Council passed a resolution authorizing submission of the final facilities plan, and on January 23, 1980, a public hearing was held on the facilities plan. The facilities plan included a recommendation for a long-term CSO control plan, which was to be implemented as phase II after certain preliminary phase I sewer system improvements were completed. Phase I of the facilities plan was implemented between 1983 and 1989, bringing the city into compliance under its original NPDES permit.

On August 14, 1987, the DNR-WRC issued public notice of its intention to issue a revised NPDES permit, which it issued on October 1, 1987, and later modified on August 17, 1989. The 1987 NPDES permit required the city to develop a final CSO control plan before December 1, 1991, that would eliminate or result in adequate treatment of combined sewage discharges containing raw sewage. After a public hearing, the Lansing City Council passed a resolution on April 25, 1991, adopted a CSO project plan, which called for the separation of the city's remaining combined sanitary and storm sewers. The DNR ultimately approved the city's CSO final project plan on March 9, 1992, and the plan was incorporated into the NPDES permit given to the city on May 20, 1993. This permit required that the city implement the final plan in accordance with certain compliance dates set forth

According to the Federal Register, the Environmental Protection Agency likely will force the city to seek a new, specific "stormwater NPDES permit" from the DEQ.[2]

The city of Lansing derives its authority to impose a legitimate special assessment or user fee for storm water detention, transportation, treatment, and disposal under the home rule city act. MCL 117.1a-117.38; MSA 5.2071(1)-5.2118.[3] The Lansing City Charter also provides that the city may take action to provide for the public welfare, health and safety,[4] and grants the

---

in a six-phase construction schedule. In the absence of any revisions or amendments, the city must adhere to the plan.

In 1994, the city formed an ad hoc committee to assist the city in establishing a system to fund the project. In August, 1995, the committee recommended the creation of a storm water enterprise fund as the means to finance the plan. On October 9, 1995, the Lansing City Council, by Ordinance No. 925, created the Stormwater Enterprise Fund, presumably because the system proved the most cost-effective to meet the federal requirements. The ordinance provides that any person who owns a parcel of land within the city that uses the city's storm water system must pay a user fee to support the cost of the storm water utility. The money from these user fees proceeds directly into the Stormwater Enterprise Fund, which the city uses to fund fifty percent of the CSO separated sewer costs. A different fund, the Sewage Enterprise Fund, supplies the revenue for the remaining fifty percent.

[2] Although unclear, the parties state that, under proposed EPA guidelines, once the city of Lansing implements the separated storm water/sewer system, it will result in a storm water system that serves more than 100,000 people and the city must request and obtain a specific storm water permit from the DEQ. See 40 CFR, parts 122 and 123.

[3] In implementing its powers under this act, the city of Lansing adopted the Lansing City Charter of 1978, which provides:

The City has the comprehensive home rule power conferred upon it by the Michigan Constitution, subject only to the limitations on the exercise of that power contained in the Constitution or this Charter or imposed by statute. The City also has all other powers which a city may possess under the Constitution and the laws of this state. [Lansing City Charter, § 1-201.]

[4] The City shall take such action, and adopt such ordinances, as shall be necessary to provide for the public peace and health and

city the authority to impose special assessments to "make public improvements within the city."[5] The Lansing City Charter also allows the city to operate and maintain public utilities.[6] To implement and maintain the public utilities, the city of Lansing may charge "just and reasonable rates" and "such other charges as may be deemed advisable for supplying all other municipal services to the inhabitants of the City and others." Lansing City Charter, § 8-303.

Although nothing in the city charter defines "public improvement" or "public utilities," the Revenue Bond Act proves a useful guide. MCL 141.101 *et seq.*; MSA 5.2731 *et seq.* Under the Revenue Bond Act, the Legislature granted the city of Lansing, like any public corporation, authority "to purchase, acquire, construct, improve, enlarge, extend or repair 1 or more public improvements and to own, operate and maintain the

---

for the safety of persons and property within the City. [Lansing City Charter, § 3-310.]

[5] Section 7-401 of the Lansing City Charter provides:

The City Council shall have the power to make public improvements within the City and, as to public improvements which are of such a nature as to benefit especially any property or properties within a district, the Council shall have the power to determine, by resolution, that the whole or any part of the expense of any public improvement shall be defrayed by special assessment upon the property in districts especially benefitted, in proportion to the benefits derived or to be derived.

[6] Section 8-301 of the Lansing City Charter provides:

The City shall have all the powers granted by law to own, operate, improve, enlarge, extend, repair, and maintain public utilities . . . including, but not by way of limitation, public utilities for supplying water and water treatment, sewage disposal and treatment, electric light and power, gas, steam, heat, public transportation, or any similar service to the municipality and the inhabitants thereof . . . .

same, within or without its corporate limits, and to
furnish the services, facilities and commodities of any
such public improvement to users within or without
its corporate limits." MCL 141.104; MSA 5.2734. The
statute specifically states that the powers granted in
the Revenue Bond Act "may be exercised notwith-
standing that no bonds are issued hereunder." MCL
141.104; MSA 5.2734. The Legislature further defined,
post-Headlee, "public improvements" as including
"storm water systems, including storm sewers, plants,
works, instrumentalities, and properties used or use-
ful in connection with the collection, treatment or dis-
posal of storm water." MCL 141.103(b); MSA
5.2733(b). In adding storm water language to the Rev-
enue Bond Act in 1992, the Legislature notably
aligned storm water treatment and disposal with
other utilities listed under the term "public improve-
ment," including the light, heat, and power utilities,
garbage collection and disposal, sewage treatment
and disposal, transportation systems, cable television
systems, stadiums, and other municipal activities that
fall within the traditional thinking of "public improve-
ments" and utilities. MCL 141.103(b); MSA 5.2733(b).

II

Determining whether a governmental exaction rep-
resents a tax, fee, or special assessment presents
unique problems. This Court previously has addressed
the distinction between a fee and a tax. In *Vernor v
Secretary of State*, 179 Mich 157; 146 NW 338 (1914),
we focused on the "reasonableness" of the motor
vehicle regulation and found that licenses, like regula-
tions, "will be upheld by the courts when plainly

intended as a police regulation, and the revenue
derived therefrom is not disproportionate to the cost
of issuing the license, and the regulation of the busi-
ness to which it applies." *Id.* at 167.

In *Ripperger v Grand Rapids*, 338 Mich 682; 62
NW2d 585 (1954), we determined that sewage charges
for use of the sewage system did not constitute a
"tax" on individual owners within the meaning of the
Revenue Bond Act even though "the payment of a fee
for the use of the sewer is, practically speaking, sub-
stantially like the enforced obligation of a tax. *Id.* at
686-687. We observed that "[a] public sewer system is
a public utility the same as a water system" and that
" '[p]ayments by the users for the service rendered
[was] not a tax . . . .' " *Id.* at 687 (citations omitted).
We also stated that sewage fees are similar to the
consumer's gas, water, or electric bills and that the
prices are set by various city boards and agencies,
not consumers. *Id.*

Subsequently, in *Merrelli v St Clair Shores*, 355
Mich 575; 96 NW2d 144 (1959), we examined building
permits for certain work performed in the construc-
tion of buildings and again distinguished user fees
from taxes:

> In short, we have considered 2 sources of municipal
> funds, differing in governmental theory, each having inher-
> ent limitations resulting therefrom. One involves an exer-
> cise of the municipal power of taxation. Its purpose is to
> raise money. The other is an exercise of the police power of
> the community. Its purpose is the protection of the public
> health, safety, and welfare. True, certain moneys may be
> obtained in connection therewith, but such moneys are inci-
> dental to the accomplishment of the primary purpose of
> guarding the public. [*Id.* at 583. Accord *Bray v Dep't of
> State*, 418 Mich 149, 162; 341 NW2d 92 (1983).]

The principles that emerge from this precedent identify two factors that are the focus for determining whether an exaction imposes a fee: the proportionality and reasonableness of the fee to the benefit conferred and the purpose of the regulation, specifically whether its purpose is to charge the user and not simply to raise revenue.[7] The Court of Appeals recently considered this distinction in *Saginaw Co v John Sexton Corp of Michigan*, 232 Mich App 202, 209-210; 591 NW2d 52 (1998), finding that "[a]lthough no bright-line test exists for distinguishing one from the other, a fee generally is exchanged for a service rendered or a benefit conferred, and some reasonable relationship exists between the amount of the fee and the value of the service or benefit." Citing *Merrelli, supra* at 582-584.

However, the majority proposes a three-part test to distinguish a tax and a fee. Although I appreciate the majority's efforts to devise a valid test for this legal conundrum, I remain unconvinced that the test the majority proposes is accurate. Even if it is, Lansing Ordinance 925 meets all three parts of the majority's test.

A

First, the majority states that a user fee "must serve a regulatory purpose rather than a revenue-raising

---

[7] The Court of Appeals has reached similar results. In *Gorney v Madison Heights*, 211 Mich App 265, 268; 535 NW2d 263 (1995), the Court of Appeals stated that "in order for a fee to be deemed a tax, there must be no reasonable relationship between the fee and the expense of the service provided. . . . However, where revenue generated by a regulatory 'fee' exceeds the cost of regulation, the 'fee' is actually a tax in disguise." Citing *Dukesherer Farms, Inc v Director, Dep't of Agriculture*, 405 Mich 1; 273 NW2d 877 (1979). 211 Mich App 269. See also *Saginaw Co v John Sexton Corp*, 232 Mich App 202; 591 NW2d 52 (1998).

purpose." *Ante* at 161. Lansing Ordinance 925 does not raise revenue for a general revenue fund. The specific language of the ordinance restricts the use of the funds raised by the storm water fee:

> All funds collected for stormwater service shall be placed in an enterprise fund and used solely for the administration, construction, operation, maintenance and replacement of the stormwater system. [Lansing Ordinance 925, § 1043.11.]

The funds collected under the ordinance are earmarked specifically for the storm water drainage system and do not serve to benefit the state by sending money into its general coffers. Even plaintiff acknowledges that the revenue derived from the exaction does not flow into a general revenue fund.[8] *Id.*

Furthermore, this aspect of the tripartite test remains vague. At first blush, the criterion seems straightforward. Upon closer scrutiny, the test is problematic, leaving open the question whether *all* the funding must serve a regulatory purpose or whether only a portion of the funding used for regulatory purposes will suffice. The storm water management system at issue uses a significant portion of the regulatory fee for capital expenditures to implement the separated sewer system. However, the overall system will benefit each landowner who uses the system by increasing property values. The landowners here receive the benefit of having their storm water flow

---

[8] In his brief, plaintiff Bolt states that he "readily concedes that the revenues derived from the Rain Tax do not flow into the City's General Fund, but are segregated cosmetically in a fund designed to finance the stormwater share of the CSO Control Program and the costs (in the future) of complying with the requirements of a stormwater NPDES permit."

from their land into the sewer system, which prevents flooding in their basements.[9] The value of the landowner's property increases in the same manner that it does with a sewer or water system by increasing the value of the property when sold and ensuring that the landowner's storm water will be properly disposed. In this sense, the ordinance serves a regulatory purpose by benefiting each parcel individually and, as part of the larger picture, the community.

B

Second, the majority states that the user fee must be proportionate to the necessary costs of the service. I agree. Although the ordinance uses the term "flat rate," it does not impose a universal charge on all properties in the city of Lansing. The ordinance imposes a fee structure based entirely upon the amount of storm water runoff by establishing a system for computing annual bills on the basis of parcel size, pervious/impervious area, and parcel development. To collect the annual revenue requirement, the ordinance uses the equivalent hydraulic area (EHA). Flat-rate parcels of land (residential parcels that are less than two acres) have a predetermined EHA and landowners pay a flat fee that varies according to the parcel's size and its development.

For commercial, industrial, or residential parcels over two acres, the city determines the EHA on an individual basis. For impervious areas, the ordinance

---

[9] This litigation began because the city's sewage system could not handle the combined overflow of storm water and sewage flowing through the same pipes. After a heavy rainfall, the sewage system would overflow, often into landowners' basements. The CSO program, according to the city, was implemented partly to resolve this problem.

states that out of every one hundred drops of rain, five drops are absorbed and ninety-five drops run off, ultimately to the storm water system. For pervious areas, eighty-five drops are absorbed and fifteen drops run off to the storm water sewer system. The city's public service department calculates the "total billable equivalent hydraulic area" for every parcel in the city and divides the figure by 1,000 to determine the parcel's EHA, which is expressed in 1,000 square feet. These rate classifications thus are based on the determination that industrial, commercial, and residential properties of more than two acres contribute more storm water runoff, because of increased impervious surfaces, than do smaller, usually single family residence parcels. The smaller parcels pay a flat rate depending on the parcel size, to compensate each owner proportionally for the runoff, and the other properties pay according to the EHA formula that applies equally to all properties in that category. Additionally, the ordinance allows both developed and undeveloped parcels to be billed on the basis of the impervious/pervious area test.

The public service department then calculates the annual storm water enterprise charge on the basis of an initial rate of $24 per 1,000 square feet of EHA. This base rate is used to calculate the rain fee for all individual parcels in Lansing on the basis of whether the parcel is a "flat rate" parcel that consists of residential property or a "measured parcel," consisting of commercial or industrial property or residential property over two acres.

Considering the fee method as a whole, the city used a logical system to compute the proportionate amount of runoff that each parcel contributes to the

overall system. This established EHA scheme repre-
sents a system that is proportional to each land-
owner's "use" of storm water. The majority attacks
the ordinance by arguing that other methods exist to
better compute the quantity and quality of the runoff.
This view ignores the substantial evidence in the
record that consultants hired by the city proposed
many alternatives before recommending the impervi-
ous-area method. The city considered three different
alternatives for storm water treatment and disposal
and found the EHA method to be the most cost-
effective and efficient. Furthermore, an analysis of
the ordinance requires that the charges must be fair
and reasonable and bear a substantial relationship to
the cost of the services and the facilities. *Vernor*,
*supra* at 167 (Courts will uphold regulations "when
plainly intended as a police regulation, and the reve-
nue derived therefrom is not disproportionate to the
cost of issuing the license, and the regulation of the
business to which it applies"). This standard implies
that the city must charge the parcels proportionally,
but that the parcels need not be measured with exact
precision, a requirement that is a near impossibility.

C

Third, the majority claims that *Ripperger* estab-
lished a "voluntariness" criterion. Aside from some
cursory language quoted from an earlier case, nothing
in *Ripperger* expressly dictates that the "voluntari-
ness" factor was decisive in that case. Furthermore,
our precedent does not establish that voluntariness
somehow constitutes a determinative factor in con-

sidering a fee to be a tax.[10] If this were the case, then other fees, such as 9-1-1 emergency charges, sewer charges, and recycling fees, would be open to attack. Simply put, in some instances, the payment of a fee is compulsory. *Cincinnati v United States*, 153 F3d 1375, 1378 (Fed, 1998) ("There may be some instances in which a municipal assessment is involuntarily imposed but would nonetheless be considered a permissible fee for services rather than an impermissible tax"). As the United States Court of Appeals for the Sixth Circuit stated in *Detroit Water & Sewage Dep't v Michigan*, 803 F2d 1411 (CA 6, 1986), the federal government now mandates that cities maintain and operate clean water systems and cities deserve some flexibility and leniency when courts define "user" to compensate for the storm water systems.[11]

---

[10] The Headlee Blue Ribbon Report implies that "[p]ayment of a tax is compulsory by law; whereas payments of user fees are only compulsory for those who use the service . . . ." *Id.*, § 5, p 29. The majority seemingly gleans support from this report, even though it is not binding precedent. Notably, this section of the report spawned a minority report, which acknowledged that "a certain amount of 'tightening' is appropriate to insure that the fees collected are used only to support the services provided," but still requested that the report recognize traditional user fees, such as recycling and emergency telephone fees. *Id.*, § 5, p 42. The minority report "recommend[ed] that the legislature define, in statute, 'tax,' 'special assessment,' and 'user fee,' but to do so in such a way that each of them may continue to be used where it is appropriate to do so to fund appropriate services and programs." *Id.*, § 5, p 43.

[11] In its opinion, the Sixth Circuit stated:

The storm water which constitutes the runoff from WCRC's roads may have come from God or nature in the first place, just as all water entering the DWSD's sewer system must have at one time or another. Nevertheless, the refuse or foreign matter that water accumulates as it courses through WCRC's roads must now be subjected by law to primary and secondary treatment to the extent such runoff enters Detroit's sewage treatment system. And to that extent, at least, WCRC is a user of the facility provided by DWSD. Any effort somehow to rely upon a different definition of "user" is

The majority engages in distinctions without logical significance by stating that sewage treatment constitutes a fee because a property owner can control the amount of sewage disposed, but the same property owner cannot control the amount of rainwater that falls on the ground. Although it is doubtful that most property owners think to control their sewage disposal and treatment or their phone calls to the emergency service, even assuming arguendo that voluntariness is a factor, the fee imposed in this case falls within the "voluntariness" definition. Landowners, if they choose, may establish rainwater collection systems on their land for catching the water. If they do so, then they may appeal to the city appeal process to seek an exemption from the annual fee payment. Evidence in the record establishes that the city has granted one hundred percent credits to some landowners who have shown that they contribute no rainwater to the system.

Additionally, landowners can choose the amount of the fee they will have to pay on the basis of whether they build on the land. More buildings on the land contributes to an increase in the fee. Thus, the initial rain fee imposed on the residents is similar to the initial fee that landowners must pay to hook up to the sanitary sewer. Once the initial fee is paid in the periodic installment (every month, annually), the user can "control" the amount of sewage disposed, thus making the sewage disposal voluntary. The same concept applies here. The landowner must pay an initial fee

---

essentially a matter of semantics more than of substance, given the state statutory scheme. [*Id.* at 1421.]

and then voluntarily can control the rainwater that flows from the property.

### III

As additional support for its opinion, the majority lists two other factors that purportedly show the fee to be a disguised tax. First, the majority notes that "the 'storm water enterprise fund' replaces the portion of the program that was previously funded by the general fund revenues from property and income taxes." *Ante* at 168. Simply because the storm water enterprise fund once was funded by property taxes does not necessarily invalidate the imposition of a regulatory fee now under Ordinance 925 and the Revenue Bond Act that allows the city to implement a sewer system.[12] The majority makes much of the fact

---

[12] See *Sarasota Co v Sarasota Church of Christ, Inc*, 667 So 2d 180, 186 (Fla, 1996) ("Although we do not find that the previous funding of stormwater services through taxation was inappropriate, we do find that the stormwater funding through the special assessment at issue complies with the dictates of chapter 403 and is a more appropriate funding mechanism under the intent of that statute"); *Vernor, supra* at 163-164 (finding the license fee for motor vehicles, which was previously classified as a user fee, to be a tax under the amended statute). See also *Detroit, supra*, in which the United States Court of Appeals for the Sixth Circuit approvingly quoted the following:

> The rule of the above cited cases is that the original construction of a sewerage system does not bind the city to forever maintain it from general taxation, nor may it be implied that a citizen may forever use the sewerage system without charge, and that a charge may therefore be made for the use of the sewerage facility, "a benefit distinct from that originally conferred by building it." The respondent city by heretofore maintaining its sewerage system through taxation did not impliedly or otherwise bind itself never to charge for its use. Such sewerage charges are but charges for a service rendered. . . . The 1951 Act . . . makes it the mandatory duty of a city which issues such revenue bonds "to fix and maintain rates and make and collect charges for the use and services of the (sewerage) system," etc. and it is of no consequence whatever that

that the city funded the first seventy-five percent of the storm water system's construction by using ad valorem taxes and special assessments. Although true, this argument ignores the fact that the question before this Court is the manner in which the city has chosen to fund the remaining twenty-five percent of the construction of the system and its maintenance and operation costs. Simply because the city may have improperly funded the construction earlier does not provide a legitimate legal argument for holding that the system in this present appeal is a tax rather than a user fee.

As an extension of this argument, the majority asserts that the seventy-five percent of the property owners who already benefit from a separated sewer program should not have to pay for the remainder of the construction that will serve the remaining twenty-five percent. However, this argument bifurcates the system into multiple parts, ignoring consideration of the system as a whole. In order to comply with the NPDES permit and ensure clean water in the future, the city must complete the storm water system and have it benefit all residents.

The majority also contends that "the fact that the storm water service charge may be secured by placing a lien on property is relevant." *Ante* at 168. I agree with the rationale of the Court of Appeals that the observation is not persuasive:

the city had theretofore exacted no service charge for the use of such system. This contention is without merit and must be denied. [*Id.* at 1416-1417, citing *Maryville v Cushman*, 363 Mo 87; 249 SW2d 347 (1952).]

> The manner by which the city has chosen to enforce the fee does not establish that the fee is a tax merely because an unpaid fee results in a lien on property. Other Lansing ordinances provide that the city's municipally owned and operated electric and drinking water distribution systems, entrusted to the Lansing Board of Water & Light, has the benefit of a lien on property for unpaid utility charges. At common law, liens arise in many situations in which a charge or fee remains unpaid, and Michigan jurisprudence recognizes mechanics liens, artisans liens, and garage keepers liens, among others. [221 Mich App 79, 87, n 6; 561 NW2d 423 (1997), citing *Nickell v Lambrecht*, 29 Mich App 191; 185 NW2d 155 (1970).]

The majority fails to cite any authority for the proposition that a lien somehow becomes relevant to this inquiry. Indeed, *Ripperger* itself states that a lien on real property in a sewage system context, although enforced in the same manner as a tax lien, does not imply that a sewage rate is tantamount to a tax.

IV

Storm water drainage systems are the wave of the future, and many cities are implementing special assessments and user fees to cope with the projected increasing cost and demand of sanitizing storm water. As the Stormwater Utility Ad Hoc Committee noted, "[t]he American Public Works Association (APWA) has concluded that 'The User Charge and the Utility Concept are the most dependable and equitable approaches available to local governments for financing stormwater management.'" City of Lansing Stormwater Utility Ad Hoc Committee Report, Draft Report, August, 1994, p 2. Michigan cities, from St. Clair Shores and Ann Arbor to Marquette, have implemented or plan to implement storm water service

programs that employ user fees and the EHA method
to fund their programs. The majority's holding sub-
jects these cities to future legal challenges and
wreaks havoc with the state's water sewage and
water disposal system.[13]

The majority ignores that the storm water treat-
ment is intimately related to the sewage fees that the
residents already pay. The storm water and the sew-
age travel through one pipe and are eventually sepa-
rated to comply with federal law. As the Court of
Appeals noted, "storm water collection, detention,
and treatment (which even plaintiff concedes was
properly subject to a fee and not a tax when com-
bined with sewage disposal), do not lose their charac-
ter as a fee by virtue of being separated from sewage
collection and disposal." 221 Mich App 87. The storm
water service charge does not lose its status as a user
fee simply because the sewage and storm water flow

---

[13] Additional authority supporting the proposition that the storm water
system in this case represents a true regulatory fee includes: *Long Run
Baptist Ass'n, Inc v Louisville & Jefferson Co Metropolitan Sewer Dist*,
775 SW2d 520, 523 (Ky App, 1989) (rejecting the plaintiffs' argument that
the storm water system was an "indirect" benefit to citizens and thus a
tax); *Smith Chapel Baptist Church v Durham*, 348 NC 632, 636; 502 SE2d
364 (1998) (holding that the user fees, established by statute, were not
based on the service to landowners, and the statute in question did not
require proof of a benefit to the landowners); *Roseburg School Dist v City
of Roseburg*, 316 Or 374, 380-381; 851 P2d 595 (1993) (finding that the
storm water system did not impose a "tax" under the Oregon Constitution
because the fee was not imposed against a specific property owner, but
rather on the user of the water service); *Twietmeyer v City of Hampton*,
255 Va 387, 392; 497 SE2d 858 (1998) (holding that the city of Hampton's
storm water management fees system was not meant "to raise general rev-
enue" and thus the ordinance requiring payment of storm water fees was
a legitimate "regulation" rather than a "tax" on residents); *Teter v Clark
Co*, 104 Wash 2d 227, 239; 704 P2d 1171 (1985) (holding the storm water
control plan to be "tools of regulation" rather than a tax).

through one pipe, but are eventually separated into two individual sewage pipes.[14]

When we examined the sewage charges at issue in *Ripperger*, we noted that the act in that case

> established beyond all doubt the principle that the disposal of sewage into the streams of this State is a matter of importance to the public health, which concerns the health of the people of the State at large, and is so essential that, if the people of a city fail to meet their responsibility by bond issue, drastic steps may be taken. [*Id.* at 687.]

The storm water system here, like the sewage system at issue in *Ripperger*, benefits both the public health of the city and each resident. Every property owner in the area receives increased property rates by being connected to a storm water and sewage treatment and disposal system. I would join the Court of Appeals and the courts of virtually every other state that have addressed similar storm water charges and classified them as "user fees" or "special assessments," thus facilitating the imperative of ensuring a clean water supply.

In sum, the storm water drainage system at issue here is a user fee because of its inherent connection to sewage treatment and disposal. Any further

---

[14] Notably, even the Headlee Blue Ribbon Commission Report, which the majority mentions to support its claim that "voluntariness" is a factor in this equation, classified sewage treatment as a user fee:

> A "fee for service" or "user fee" is a payment made for the voluntary receipt of a measured service, in which the revenue from the fees are used only for the service provided. Examples include municipal sewer charges . . . . [Report, *supra*, § 5, p 30.]

I would contend that sewage and storm water runoff are closely aligned and do not lose their characteristics by being separated.

attempts to define taxes and user fees should be addressed to the Legislature.

For the stated reasons, I dissent, and I would affirm the decision of the Court of Appeals.

MALLETT, C.J., and CAVANAGH, J., concurred with BOYLE, J.