# STATE OF MICHIGAN

# COURT OF APPEALS

---

NICOLA BINNS, JAYNE CARVER, SUSAN
MCDONALD, GOAT YARD, LLC, and END OF
THE ROAD MINISTRIES, LLC,

       Plaintiffs,

v

CITY OF DETROIT, CITY OF DETROIT
WATER AND SEWAGE DEPARTMENT,
DETROIT BOARD OF WATER
COMMISSIONERS, and GREAT LAKES
WATER AUTHORITY,

       Defendants.

UNPUBLISHED
November 6, 2018

No. 337609
Original Action
(Headlee Amendment)

---

DETROIT ALLIANCE AGAINST THE RAIN
TAX, DETROIT IRON & METAL COMPANY,
AMERICAN IRON & METAL COMPANY,
MCNICHOLS SCRAP IRON & METAL
COMPANY, MONIER KHALIL LIVING
TRUST, and BAGLEY PROPERTIES, LLC,

       Plaintiffs,

v

CITY OF DETROIT, DETROIT WATER AND
SEWAGE DEPARTMENT, and DETROIT
BOARD OF WATER COMMISSIONERS,

       Defendants.

No. 339176
Original Action
(Headlee Amendment)

---

Before: RIORDAN, P.J., and MURPHY and BOONSTRA, JJ.

PER CURIAM.

-1-

In Docket No. 337609, plaintiffs, Nicola Binns, Jayne Carver, Susan McDonald, Goat Yard, LLC, and End of the Road Ministries, LLC (referred to collectively as the Binns plaintiffs), filed this original action under Const 1963, art 9, §§ 25-34, popularly known as the Headlee Amendment.[1] In Docket No. 339176, plaintiffs, Detroit Alliance Against the Rain Tax (DAART), Detroit Iron & Metal Company, American Iron & Metal Company, McNichols Scrap Iron & Metal Company, the Monier Khalil Living Trust, and Bagley Properties, LLC (referred to collectively as the DAART plaintiffs),[2] likewise filed an original action under the Headlee Amendment. This Court consolidated these original actions. *Detroit Alliance Against the Rain Tax v Detroit*, unpublished order of the Court of Appeals, entered October 24, 2017 (Docket No. 339176). In accordance with MCR 7.206(E)(3)(b), we now deny plaintiffs' requests for relief.

## I. FACTUAL AND PROCEDURAL HISTORY

In both cases, plaintiffs,[3] all of whom are property owners in the city of Detroit or, in the case of DAART, an unincorporated voluntary association of property owners in the city of Detroit, allege that a drainage charge assessed by the city of Detroit and its agencies, the Detroit Water and Sewage Department (DWSD) and the Detroit Board of Water Commissioners (BWC)

---

[1] The Headlee Amendment "grants this Court original jurisdiction to hear and decide Headlee Amendment claims[.]" *City of Riverview v Michigan*, 292 Mich App 516, 520; 808 NW2d 532 (2011); see also Const 1963, art 9, § 32 ("Any taxpayer of the state shall have standing to bring suit in the Michigan State Court of Appeals to enforce the provisions of Sections 25 through 31, inclusive, of this Article . . . ."); MCL 600.308a(1) ("An action under section 32 of article 9 of the state constitution of 1963 may be commenced in the court of appeals, or in the circuit court in the county in which venue is proper, at the option of the party commencing the action.").

[2] The original plaintiffs other than DAART in Docket No. 339176 were Galilee Missionary Baptist Church, Danto Furniture Company, Central Avenue Auto Parts, and Judith Sale, but pursuant to a stipulation of the parties, those plaintiffs were dismissed, and the other plaintiffs identified above were substituted into the case "as DAART Representative and Named Plaintiffs in place of the dismissed parties." *Detroit Alliance Against the Rain Tax v Detroit*, unpublished order of the Court of Appeals, entered March 27, 2018 (Docket No. 339176). We also note that on May 31, 2018, a stipulation was filed in the DAART case to add Belmont Shopping Center, LLC, as an additional representative plaintiff. We deny this request as moot in light of our conclusion in this opinion that plaintiffs are not entitled to relief in these cases. See *B P 7 v Bureau of State Lottery*, 231 Mich App 356, 359; 586 NW2d 117 (1998) ("As a general rule, an appellate court will not decide moot issues. A case is moot when it presents only abstract questions of law that do not rest upon existing facts or rights. An issue is deemed moot when an event occurs that renders it impossible for a reviewing court to grant relief.") (citations omitted).

[3] We will use the general term "plaintiffs" when referring collectively to both the Binns plaintiffs and the DAART plaintiffs.

(referred to collectively as the Detroit defendants),[4] constitutes a tax for which voter approval has not been obtained as required by the Headlee Amendment. In each case, the Detroit defendants seek dismissal or a judgment in their favor on multiple grounds, including: this Court lacks subject-matter jurisdiction because plaintiffs' actions are preempted by federal regulations; plaintiffs have failed to state a claim because the drainage charge was preauthorized by the Detroit Charter and is thus exempt from the strictures of the Headlee Amendment; and the drainage charge constitutes a user fee, rather than a tax, and is thus not subject to the Headlee Amendment.

The pertinent facts concerning the Detroit drainage charge are derived by the parties largely from documents published by the Detroit defendants. As with many older cities, Detroit has a combined sewer system, meaning that storm water runoff flows into the same pipes as unsanitary wastewater, i.e., sewage. Every year, billions of gallons of storm water flow into Detroit's combined sewer system from impervious surfaces, i.e., hard surfaces that limit the ability of storm water to soak into the ground. Impervious surfaces include roofs, driveways, parking lots, and compacted gravel and soil. This storm water is contaminated with dirt and debris. The combined sewage is treated at Detroit's wastewater treatment plant (WTP) and combined sewer overflow (CSO) facilities before being released back into the environment. Federal and state regulations have required the DWSD to invest more than $1 billion in CSO control facilities in order to prevent untreated CSOs from spilling into Michigan waterways. The DWSD has instituted drainage charges that pay for capital, operations, and maintenance costs for the WTP, CSO control facilities, and combined sewer system components.[5]

As of January 2016, the DWSD no longer provides services to wholesale suburban customers; that function is now performed by defendant, the Great Lakes Water Authority (GLWA). The GLWA is a regional water, sewer, and storm water authority established through a September 9, 2014 memorandum of understanding (MOU) executed between the city of Detroit, Oakland County, Wayne County, Macomb County, and the state of Michigan, pursuant to 1955 PA 233. *United States v Detroit*, unpublished order of the United States District Court for the Eastern District of Michigan, entered December 15, 2015 (Docket No. 77-71100), p 1. Under the MOU, the GLWA operates, controls, and improves the regional water and sewage assets owned by the city of Detroit – which were previously operated by the DWSD – under lease agreements for an initial term of 40 years, and the city of Detroit continues to manage and operate its own local water and sewer infrastructure. *Id*. at 1-2. In short, the city of Detroit and its agencies continue to manage the supply of water, drainage, and sewage services to retail customers of the city of Detroit. *Id*. at 4. Pursuant to a December 15, 2015 order entered in a

---

[4] The city of Detroit is a municipal corporation that, through the DWSD, provides water, sewer, and drainage services to its customers. The BWC is a seven-member board whose members are appointed by the Detroit Mayor; the BWC oversees the DWSD.

[5] There is no plan to separate Detroit's sewer system. The DWSD explains: "Detroit's combined sewer system includes nearly 3,000 miles of sewer collection piping. The costs to effectively separate the sewer system would be highly cost prohibitive. While selective sewer separation may be an option in some parts of the City, widespread implementation is not anticipated."

-3-

decades-old federal lawsuit concerning efforts to ensure the city of Detroit's compliance with federal requirements pertaining to its combined sewer system,[6] the city of Detroit's BWC must establish retail rates for the city's water, drainage, and sewer services, in order to satisfy revenue requirements established by the GLWA for water, sewer, and drainage services in addition to the expenses of operating the city of Detroit's local water and sewer infrastructure. *Id*. The city of Detroit is authorized by the federal district court's order to continue or modify its customary practices regarding the establishment of rates for water, sewage, and drainage charges. *Id*. The federal district court's order further provides, in part:

> The [BWC] shall continue to exercise its existing authority under the City Charter to assess drainage fees, charges, or assessments to the users of the City's local water and combined sewer and drainage infrastructure because these charges are necessary and critical to ensure that the City is able to comply with (i) its regulatory requirements under NPDES [National Pollutant Discharge Elimination System[7]] Permit No. MI0022802 to treat and dispose of the City's combined sewage overflows and (ii) its obligations under the Clean Water Act. The City may set these drainage charges based, in part, on the impervious area of each parcel of land assessed a drainage charge, or on some other legally acceptable method for assessing the charge, in order to provide each user with a transparent and equitable method for calculating the drainage charge associated with managing, operating and improving the combined sewer and drainage infrastructure respectively allocable to each user. [*Id*. at 5-6.]

DWSD customers have been paying some form of a drainage charge as part of their water and sewer bills since 1975. Effective beginning in October 2016, the DWSD revised or updated its method of calculating the drainage charge for property owners in Detroit.[8] On the basis of flyover views and aerial photography conducted in 2015 to determine impervious areas, as well as city assessor data, the DWSD identified 22,000 parcels that had not previously been charged for drainage, including parcels that did not have a water account and thus were not in the DWSD billing system. The DWSD determined that these parcels, except those owned by faith-based institutions, would be charged $750 per impervious acre beginning in October 2016.[9] All customers would be charged on the basis of impervious surface area by 2018. In particular, the new impervious surface rate would apply to industrial properties beginning in January 2017, commercial properties in April 2017, tax-exempt properties (other than faith-based) in June 2017, residential properties in October 2017, and faith-based properties in January 2018.

---

[6] Some of the procedural history concerning this federal litigation, which commenced in 1977, is recounted in *Detroit v Michigan*, 803 F2d 1411, 1412-1413 (CA 6, 1986).

[7] The NPDES is "a federal permit program designed to regulate the discharge of polluting effluents." *Int'l Paper Co v Ouellette*, 479 US 481, 489; 107 S Ct 805; 93 L Ed 2d 883 (1987).

[8] Detroit ordinances set forth the authority of the Detroit defendants to levy such charges. See Detroit Ordinances, §§ 56-3-2 and 56-3-12.

[9] This amount was later lowered in varying degrees as part of a phase-in plan discussed later.

Transition credits would apply for two fiscal years. The DWSD adopted its phased-in approach to the updated drainage charge in order to afford customers time to prepare for the new rate and to avoid overwhelming the DWSD billing system. The DWSD has asserted that it possesses various options if a customer refuses to pay the drainage charge, including termination of water service for the property, the imposition of a lien on the property, a legal action to recover unpaid fees, and the suspension or revocation of a license to do business in the city of Detroit.

No drainage charge will be imposed for parcels containing fewer than .02 impervious acres because that is the margin of error from flyover views. Further, if a property owner verifies that storm water runoff flows directly into the Detroit River or the Rouge River and that the parcel is disconnected from the DWSD system, there is no charge. The DWSD provides procedures whereby customers may dispute the measurement of the impervious acreage for a parcel or may seek an adjustment in billing on the basis of a modification to the impervious surface area or the direct discharge of surface waters to one of the above-mentioned rivers. The DWSD provided the following explanation in a publication: "By simply reducing the impervious cover on a property, customers reduce the amount of storm water leaving their property and thus reduce their drainage charge. Examples of impervious cover reduction include removal of asphalt or concrete parking spaces and replacing the impervious cover." The DWSD also permits drainage credits of up to 80% for customers who use green infrastructure systems or practices that reduce the amount of storm water flowing from the property into the DWSD's combined sewer system. "Green infrastructure examples include disconnecting downspouts, rain gardens, bioretention practices, installing permeable pavement, green roof designs, detention and subsurface detention and other practices that manage storm water volume."

The DWSD indicated that its drainage revenue requirement would exceed $151 million for fiscal year 2017, including more than $125 million in operation and implementation costs as well as drainage credits. The DWSD's expense for debt service is $59.8 million; this expense is comprised essentially of a GLWA-held mortgage payment for facilities that are in place to address wet weather flows. The DWSD notes that "[t]his debt service expense relates to both municipal bond issues and to state revolving fund loans." Bad debt in the form of uncollectible bills must be recovered from the DWSD's other remaining customers. In compliance with federal Environmental Protection Agency (EPA) regulations to prevent excessive pollution into waterways, the DWSD invested more than $1 billion in CSO control facilities. "The cost was financed almost entirely through bonds which are being repaid by the drainage fee. Direct CSO costs have two components: $25.7 million for annual CSO bond debt, and $6.2 million in annual operating costs specific to the control facilities." The DWSD expects the rate of the drainage charge to decrease by 32% through fiscal year 2019.

The DWSD does not charge the city of Detroit itself a drainage fee for storm water flowing from city streets into the combined sewer system. The DWSD explains: "City streets, which are lower than parcels, are part of the conveyance infrastructure for facilitating the flow of storm water from Detroit properties into the catch basins, then into the combined sewer system, and then finally terminating at the [WTP]." However, "[c]ity owned parcels will not be characterized as conveyance. This term only applies to city streets, i.e., areas common to all that serve as storm water conveyance."

-5-

Effective in April 2017, and applied retroactively to October 2016, the DWSD has revised its drainage charge policy to provide transition credits for properties that were not previously billed for drainage services or that were previously billed on the basis of meter size and are now converted to the drainage rate based on impervious area. Under this revised policy, full implementation of the uniform impervious area based drainage charge is to be phased in over five years. Further, residential parcels received an automatic credit of 25% to reflect the flow characteristics of such parcels. The DWSD also indicated that it would provide a property owner with up to 50% of the cost, with a maximum payment of $50,000, for eligible green storm water infrastructure measures installed and maintained by the property owner.

In Docket No. 337609, the Binns plaintiffs commenced this original action under the Headlee Amendment by filing a complaint on March 27, 2017, and filed a first amended complaint one day later. The Binns plaintiffs asserted that the Detroit drainage charge constitutes a disguised tax for which voter approval has not been obtained as purportedly required by the Headlee Amendment. The Binns plaintiffs requested "declaratory relief that the 'drainage charge' is a tax, injunctive relief to stop the unconstitutional collection of this tax, and monetary relief in the form of return of tax payments, costs, and attorney fees." The Binns plaintiffs sought to pursue this action as representatives of a proposed class consisting of all persons who have been charged the drainage fee and who own property in Detroit.

On May 2, 2017, the Detroit defendants filed an answer and affirmative defenses to the Binns plaintiffs' complaint. The Detroit defendants sought dismissal of the complaint, a finding of no cause of action, or denial of the Binns plaintiffs' requested relief. The Detroit defendants asserted numerous affirmative defenses, including: this Court lacks subject-matter jurisdiction because the Binns plaintiffs' claims are preempted by federal law, regulations, or orders mandating assessment of the drainage charge; the Binns plaintiffs have failed to state a claim because the drainage charge was authorized by the Detroit Charter before the Headlee Amendment was ratified such that voter approval is not required under the Headlee Amendment; the Binns plaintiffs' claims are barred by the Revenue Bond Act of 1933, MCL 141.101 *et seq.*; and the drainage charge constitutes a valid user fee, rather than a tax that is subject to the Headlee Amendment.

On May 3, 2017, the Binns plaintiffs filed a motion for a preliminary injunction to preclude assessment or enforcement of the drainage charge until it is approved by voters. The Detroit defendants filed an answer opposing the Binns plaintiffs' motion for a preliminary injunction. On June 20, 2017, this Court entered an order denying the Binns plaintiffs' motion for a preliminary injunction. *Binns v Detroit*, unpublished order of the Court of Appeals, entered June 20, 2017 (Docket No. 337609).

On June 26, 2017, the Binns plaintiffs filed a motion for class certification. On June 29, 2017, the Detroit defendants filed a motion seeking permission to extend the due date for responding to the Binns plaintiffs' motion for class certification to 90 days after this Court rules on the Detroit defendants' request for peremptory dismissal of plaintiffs' claim; the Detroit defendants asserted that the Binns plaintiffs' motion for class certification was premature because the Detroit defendants' request for peremptory dismissal of plaintiffs' complaint on multiple grounds was still pending and because discovery had not yet occurred in this case. The Binns plaintiffs filed an answer to the Detroit defendants' motion for extension of the due date

for responding to the Binns plaintiffs' motion for class certification; the Binns plaintiffs noted that there was no properly filed motion to dismiss pending and that the Detroit defendants had not requested discovery when the Binns plaintiffs filed the class certification motion.

On August 4, 2017, the Binns plaintiffs filed a request for entry of default against the GLWA, which had been named as a defendant in the Binns plaintiffs' action but had not yet filed a pleading or otherwise asserted a defense. On August 10, 2017, an attorney filed a notice of appearance on behalf of the GLWA. On the same date, the GLWA filed a motion to strike or set aside the request for default and for leave to answer or otherwise respond to the Binns plaintiffs' first amended complaint. The GLWA stated that it had not been served with the Binns plaintiffs' original complaint and that no proof of service had been filed regarding the first amended complaint, although the GLWA acknowledged that the first amended complaint had been delivered to the offices of the GLWA on June 26, 2017, and that a courtesy copy of the first amended complaint had been previously provided to the GLWA sometime in the spring of 2017. The GLWA stated that the request for default was not notarized or supported by affidavit. The GLWA has not received any notice that the Clerk of this Court has entered a default, and the Binns plaintiffs have not moved for the entry of a default judgment. Further, the GLWA stated that it possesses a meritorious defense. The GLWA does not set storm water rates for properties located in Detroit, the properties owned by the Binns plaintiffs are located in Detroit, and the purported class that the Binns plaintiffs seek to represent consists of persons who own property in Detroit. The GLWA does not operate the combined sewer system in Detroit.

On August 23, 2017, this Court entered an order in the Binns plaintiffs' case stating as follows:

> The Court DIRECTS the parties to file supplemental briefs within 28 days of the date of this order addressing the following:
>
> (1) Does the pre-existing authority exemption of the Headlee Amendment, Const 1963, art 9, § 31 (no voter approval for taxes is needed if the taxes were "authorized by law or charter" when the amendment was ratified in 1978), apply in light of the fact that the City's charter had been revised/replaced twice since 1974, with the City's actual authority for levying the at-issue drainage charge deriving from the latest 2012 charter? See *Streat v Vermilya*, 268 Mich 1, 5; 255 NW 604 (1934) (stating that an adopted new charter "will entirely supersede the former charter").
>
> (2) Applying the factors articulated in *Bolt v City of Lansing*, 459 Mich 152; 587 NW2d 264 (1998), use documentary evidence to support your position that the drainage charge is either a tax or a fee.
>
> The motions that have been filed remain pending. [*Binns v Detroit*, unpublished order of the Court of Appeals, entered August 23, 2017 (Docket No. 337609).]

The parties subsequently filed supplemental briefs in accordance with this Court's order.

Meanwhile, on July 11, 2017, the DAART plaintiffs commenced their original action under the Headlee Amendment by filing a complaint. Like the Binns plaintiffs, the DAART plaintiffs asserted that the drainage charge constituted a tax such that the imposition of the drainage charge without the approval of the voters constituted a Headlee Amendment violation. The DAART plaintiffs requested certification as a class action. The DAART plaintiffs asked for a declaration that the drainage charge is a tax that is void because it has not been approved by voters as required by the Headlee Amendment, a refund of all drainage charges collected since October 1, 2016, the dissolution of any DWSD liens against properties for an owner's failure to pay the drainage charge, and an award of costs and attorney fees.[10]

On August 29, 2017, the Detroit defendants filed an answer and affirmative defenses in the DAART case. The Detroit defendants requested peremptory dismissal of the complaint or a finding of no cause of action. The Detroit defendants asserted the same pertinent affirmative defenses as summarized above in connection with the Binns case.

On September 28, 2017, the DAART plaintiffs filed a motion to consolidate the DAART case with the Binns case. On October 5, 2017, the Detroit defendants filed a response indicating that they did not oppose consolidation in general but suggesting that the DAART plaintiffs had improperly delayed seeking consolidation until after the submission of supplemental briefs in the Binns case in order to obtain an unfair advantage in briefing. On October 24, 2017, this Court entered an order granting the motion to consolidate and directing the parties to file supplemental briefs addressing the questions set forth in this Court's August 23, 2017 order in the Binns case. *Detroit Alliance Against the Rain Tax v Detroit*, unpublished order of the Court of Appeals, entered October 24, 2017 (Docket No. 339176). The parties in the DAART case filed supplemental briefs in accordance with this Court's order.

Meanwhile, on October 9, 2017, the DAART plaintiffs filed a motion for class certification. On October 16, 2017, the Detroit defendants filed a motion for an extension of time to respond to the DAART plaintiffs' class certification motion, for essentially the same reasons they sought such an extension in the Binns case.

On January 5, 2018, a motion for leave to file an amici-curiae brief was filed by entities that own commercial property in Detroit; those entities are Trappers Properties, LLC, Atheneum Hotel Corporation, Helicon Development, LLC, Pegasus Greektown, LLC, PF Investments, LLC, and Foreman Properties, LLC. On February 13, 2018, this Court granted the motion for leave to file an amici-curiae brief. *Detroit Alliance Against the Rain Tax v Detroit*, unpublished order of the Court of Appeals, entered February 13, 2018 (Docket No. 339176). The amici-curiae brief was subsequently filed in this Court. The Detroit defendants and the DAART plaintiffs filed briefs responding to the amici-curiae brief.[11]

---

[10] The DAART plaintiffs sued only the Detroit defendants; the GLWA was not named as a defendant in the DAART plaintiffs' action.

[11] Amici curiae filed a motion for leave to participate in oral argument. That motion is denied as moot in light of our disposition of these cases without oral argument pursuant to MCR

II.  WHETHER THE DRAINAGE CHARGE IS A USER FEE OR A TAX

Plaintiffs argue that the drainage charge constitutes a tax that is subject to the Headlee Amendment, while the Detroit defendants contend that the drainage charge constitutes a valid user fee that is not subject to the Headlee Amendment.  We agree with the Detroit defendants.

Whether the drainage charge constitutes a tax or a user fee is a question of law that this Court reviews de novo.  *Bolt*, 459 Mich at 158.  Plaintiffs have the burden of establishing the unconstitutionality of the drainage charge.  *Jackson Co v City of Jackson*, 302 Mich App 90, 98; 836 NW2d 903 (2013).

We are deciding these cases without oral argument pursuant to MCR 7.206(E)(3)(b).  Referral to a judicial circuit pursuant to MCR 7.206(E)(3)(d) for discovery or fact-finding is not necessary in these cases.  As explained earlier, this Court's order directing supplemental briefing instructed the parties to use documentary evidence to support their respective positions regarding whether the drainage charge is a tax or a user fee.  The parties thereafter filed supplemental briefs, and plaintiffs in both cases submitted extensive documentary evidence.  Plaintiffs in neither case have suggested that there is a need for referral to a judicial circuit for discovery or fact-finding proceedings.  In fact, the DAART plaintiffs have specifically stated that the case can be decided as a matter of law on the basis of the factual background provided by the pleadings, briefs, and exhibits submitted to this Court, without referral to a judicial circuit for discovery.  We conclude that the record is sufficiently complete for this Court to rule as a matter of law.

The relevant provision of the Headlee Amendment, Const 1963, art 9, § 31, states as follows:

> Units of Local Government are hereby prohibited from levying any tax not authorized by law or charter when this section is ratified or from increasing the rate of an existing tax above that rate authorized by law or charter when this section is ratified, without the approval of a majority of the qualified electors of that unit of Local Government voting thereon. . . .

"An application of § 31 is triggered by the levying of a tax."  *Jackson Co*, 302 Mich App at 98, citing *Bolt*, 459 Mich at 158-159.  The levying of a new tax without voter approval violates § 31.  *Jackson Co*, 302 Mich App at 99, citing *Bolt*, 459 Mich at 158.  However, a charge that constitutes a user fee is not subject to the Headlee Amendment.  *Jackson Co*, 302 Mich App at 99, citing *Bolt*, 459 Mich at 159.

"There is no bright-line test for distinguishing between a valid user fee and a tax that violates the Headlee Amendment."  *Bolt*, 459 Mich at 160.  In general, "a fee is exchanged for a service rendered or a benefit conferred, and some reasonable relationship exists between the amount of the fee and the value of the service or benefit.  A tax, on the other hand, is designed to

---

7.206(E)(3)(b).  See generally, *B P 7 v Bureau of State Lottery*, 231 Mich App 356, 359; 586 NW2d 117 (1998).

raise revenue." *Id*. at 161 (quotation marks and citations omitted). In *Bolt*, our Supreme Court identified three key criteria to use in distinguishing between a user fee and a tax: (1) a user fee serves a regulatory purpose rather than a revenue-raising purpose; (2) a user fee is proportionate to the necessary costs of the service; and (3) a user fee is voluntary in that property owners are able to refuse or limit their use of the service. *Id*. at 161-162. "These criteria are not to be considered in isolation, but rather in their totality, such that a weakness in one area would not necessarily mandate a finding that the charge is not a fee." *Wheeler v Shelby Charter Twp*, 265 Mich App 657, 665; 697 NW2d 180 (2005) (brackets, quotation marks, and citations omitted).

In *Bolt*, 459 Mich at 154, our Supreme Court held that the city of Lansing's storm water service charge was a tax for which voter approval was required under the Headlee Amendment, and because the city of Lansing did not obtain voter approval, the storm water service charge was unconstitutional and thus void. The pertinent facts of *Bolt* are as follows. The city of Lansing decided to separate the remaining portion of its combined sanitary and storm sewer systems; approximately 75% of the property owners were already served by a separated storm and sewer system. *Id*. at 154-155, 155 n 3. The cost of this project was $176 million over 30 years. *Id*. at 155. In order to fund the storm water share of this project, the city of Lansing created a storm water enterprise fund and imposed the storm water service charge on each parcel of real property, using a formula to estimate each parcel's storm water runoff. *Id*. The storm water enterprise fund replaced funding previously provided "by general fund revenues secured through property and income taxes." *Id*. at 155 n 4. Estimated storm water runoff was calculated by equivalent hydraulic area (EHA), which was based on "the amount of pervious and impervious areas within the parcel multiplied by the runoff factors applicable to each." *Id*. at 155-156. However, a flat rate was charged for residential parcels of two acres or less. *Id*. at 156.

Our Supreme Court noted in *Bolt* that approximately 63% of the cost of the project was for capital expenditures. *Id*. at 163. "This constitutes an investment in infrastructure as opposed to a fee designed simply to defray the costs of a regulatory activity." *Id*. Our Supreme Court quoted with approval the analysis of the dissenting Court of Appeals judge on that point:

> No effort has been made to allocate even that portion of the capital costs that will have a useful life in excess of thirty years to the general fund. This is an investment in infrastructure that will substantially outlast the current "mortgage" that the storm water charge requires property owners to amortize. At the end of thirty years, property owners will have fully paid for a tangible asset that will serve the city for many years thereafter. Accordingly, the "fee" is not structured to simply defray the costs of a "regulatory" activity, but rather to fund a public improvement designed to provide a long-term benefit to the city and all its citizens. The revenue to be derived from the charge is clearly in excess of the direct and indirect costs of actually using the storm water system over the next thirty years and, being thus disproportionate to the costs of the services provided and the benefits rendered, constitutes a tax.
>
> I do not believe that the capital investment component of a true fee may be designed to amortize such an expense, and to enable the city to fully recoup its investment, in a period significantly shorter than the actual useful service life of the particular public improvement. This fundamental principle of basic

accountancy guides public utility regulators, as well as tax assessors. It ought to apply equally here.

> This is not to say that a city can never implement a storm water or sewer charge without running afoul of art 9, § 31. A proper fee must reflect the bestowal of a corresponding benefit on the person paying the charge, which benefit is not generally shared by other members of society. Where the charge for either storm or sanitary sewers reflects the actual costs of use, metered with relative precision in accordance with available technology, including some capital investment component, sewerage may properly be viewed as a utility service for which usage-based charges are permissible, and not as a disguised tax. [*Id*. at 163-165 (brackets and citations omitted).]

Our Supreme Court in *Bolt* further stated that the first two factors for determining whether a charge constitutes a user fee were not satisfied because "the charges imposed do not correspond to the benefits conferred." *Id*. at 165. The Court noted that approximately 75% "of the property owners in the city were already served by a separated storm and sanitary sewer system." *Id*. Many of those property owners had already "paid for such separation through special assessments." *Id*. Yet they were "charged the same amount for storm water service as the [25%] of the property owners who will enjoy the full benefits of the new construction." *Id*. "The appeal process and available credits do not make the charge proportionate to the necessary costs of the service because there is no credit for the [75%] of the property owners who are already served by a separated sewer system." *Id*. at 165 n 15. "[T]he charge applies to all property owners, rather than only to those who actually benefit. A true 'fee,' however, is not designed to confer benefits on the general public, but rather to benefit the particular person on whom it is imposed." *Id*. at 165. In short, "the lack of correspondence between the charges and the benefit conferred demonstrates that the city has failed to differentiate any particularized benefits to property owners from the general benefits conferred on the public." *Id*. at 166. This conclusion was buttressed by the fact that the acknowledged goal of the storm water service charge was to address environmental concerns regarding water quality. *Id*.

Further supporting the conclusion in *Bolt* that the first two factors were not satisfied was the absence of a significant element of regulation. *Id*. Only the amount of rainfall shed from a parcel as surface runoff was regulated; there was no consideration of "the presence of pollutants on each parcel that contaminate such runoff and contribute to the need for treatment before discharge into navigable waters." *Id*. at 166-167. Nor was there any effort "to distinguish between those responsible for greater and lesser levels of runoff[,]" and street rights of way were excluded from the charge. *Id*. at 167. "Moreover, there is no end-of-pipe treatment for the storm water runoff. Rather, the storm water is discharged into the river untreated." *Id*.

The third factor – voluntariness – was also unsatisfied in *Bolt*. *Id*. A tax is compulsory by law, whereas user fees are compulsory only "for those who use the service, have the ability to choose how much of the service to use, and whether to use it at all." *Id*. (quotation marks and citation omitted). The charge in *Bolt* was "effectively compulsory. The property owner has no choice whether to use the service and is unable to control the extent to which the service is used." *Id*. at 167-168. Suggesting that a property owner may control the amount of the charge by building less on the property is not "a legitimate method for controlling the amount of the fee

because it is tantamount to requiring property owners to relinquish their rights of ownership to their property by declining to build on the property." *Id*. at 168.

Finally, the *Bolt* Court noted additional factors that were not dispositive but that further supported the conclusion that the storm water service charge was a tax. *Id*. The storm water enterprise fund replaced a portion of a program that was previously funded by general fund revenues from income and property taxes. *Id*. Also, a lien could be placed on property for failing to pay the storm water service charge. *Id*. "While ordinarily the fact that a lien may be imposed does not transform an otherwise proper fee into a tax, this fact buttresses the conclusion that the charge is a tax in the present case, where the charges imposed are disproportionate to the costs of operating the system and to the value of the benefit conferred, and the charge lacks an element of volition." *Id*. That the storm water charge was billed through the city assessor's office and the bill was sent with property tax statements was also significant. *Id*. at 168-169.

This Court applied the *Bolt* test to a similar storm water charge in *Jackson Co*. In *Jackson Co*, 302 Mich App at 93, the city of Jackson "created a storm water utility and imposed a storm water management charge on all property owners within the city to generate revenue to pay for the services provided by the utility, which include, among others, street sweeping, catch basin cleaning, and leaf pickup and mulching." In so doing, the city of Jackson "shift[ed] the method of funding certain preexisting government activities from tax revenues to a utility charge[.]" *Id*. This Court held that "the city's storm water management charge is a tax, the imposition of which violates the Headlee Amendment because the city did not submit [the ordinance creating the charge] to a vote of the qualified electors of the city." *Id*.

The pertinent facts of *Jackson Co* are as follows. The city of Jackson maintained separate storm water and waste water systems. *Id*. at 94. The city of Jackson historically funded the operation of the storm water management system through general and street funds, including ad valorem property taxes, gasoline taxes, and vehicle registration fees. *Id*. In 2011, however, the city of Jackson adopted an ordinance funding the storm water management program through a storm water management charge imposed on each parcel of real property in the city. *Id*. at 95. The charge was computed through a formula developed to roughly estimate the amount of storm water runoff from each parcel. *Id*. In particular, the EHA was used to estimate the amount of storm water running off each parcel on the basis of the impervious and pervious surface areas of each parcel. *Id*. at 95-96. For residential parcels of two acres or less, a flat rate was used in lieu of individual measurements. *Id*. at 96. A property owner could receive credits for actions taken to reduce storm water runoff. *Id*. at 97. An administrative appeal was available to challenge the estimate of impervious area or the amount of credit awarded against the charge. *Id*.

Applying the *Bolt* factors, this Court in *Jackson Co* stated that the storm water charge served dual purposes. *Id*. at 105. A regulatory purpose was furthered by financing the protection of local waterways from solid pollutants carried in storm water discharged from properties, and a general revenue-raising purpose was served by shifting the funding of preexisting government activities from declining general and street fund revenues to a storm water charge. *Id*. "This latter method of revenue generation raises revenue for general public purposes by augmenting the city's general and street funds in an amount equal to the revenue previously used to fund the activities . . . now . . . assigned to the storm water utility." *Id*. at 106. This Court concluded that "the minimal regulatory purpose served by the ordinance and the related management charge is

convincingly outweighed by the revenue-raising purpose of the ordinance." *Id.* The ordinance "contain[ed] few provisions of regulation and no provisions that truly regulate the discharge of storm and surface water runoff, with the exception of the provision that allows for credits against the management charge for the use of city-approved storm water best management practices." *Id.* Like in *Bolt*, the ordinance in *Jackson Co* "fail[ed] to require either the city or the property owner to identify, monitor, and treat contaminated storm and surface water runoff and allow[ed] untreated storm water to be discharged into the Grand River." *Id.* This constituted a regulatory weakness akin to that of the city of Lansing ordinance deemed unconstitutional in *Bolt*.

Further, there was evidence in *Jackson Co* that "the desire to protect the city's general and street funds from the costs of operating and maintaining the existing storm water management system constituted the most significant motivation for adopting the ordinance and management fee." *Id.* at 106-107. The city of Jackson admitted "that budgetary pressures, including declining general fund revenue, necessitated the tapping of new sources of funding for the maintenance of the storm water system." *Id.* at 107. This Court thus concluded that there was "an overriding revenue-generating purpose that outweighs the minimal regulatory purpose of the charge and, therefore, that the charge is a tax, not a utility user fee." *Id.*

In addition, "the lack of a correspondence between the charge imposed and any particularized benefit conferred by the charge supports a conclusion that the charge is a tax and not a utility user fee." *Id.* at 108. This Court could not "identify any particularized benefit the charge confers on the property owners that is not also conferred upon the general public." *Id.* The city of Jackson indicated that the storm water charge helped to protect public health and safety, reduce the likelihood of flooding, reduce land erosion, and prevent sewer overflows. *Id.* But this Court held that addressing such concerns "benefit[s] not only the property owners subject to the management charge, but also everyone in the city in roughly equal measure, as well as" persons operating motor vehicles in the city and persons who use the Grand River downriver from the city. *Id.* at 109. "This lack of a correspondence between the management charge and a particularized benefit conferred to the parcels supports our conclusion that the management charge is a tax." *Id.*

With respect to the proportionality of the storm water charge, this Court noted that "residential parcels measuring two acres or less are charged a flat rate based on the average EHA of all single family parcels, and not on the individual measurements of each parcel's impervious and pervious areas." *Id.* at 110. Single-family residential parcels comprised 83% of the parcels within the city. *Id.* By contrast, residential parcels in excess of two acres, as well as commercial, industrial, and institutional parcels of all sizes, were charged on the basis of individual measurements of each parcel's impervious and pervious areas. *Id.*

> This method of apportioning the management charges among all urban properties emphasizes administrative convenience and ease of measurement and, thereby, suggests an absence of a close proportional relationship between the amount of runoff attributable to a particular parcel and the management charge, as does the fact that the method of calculating the charge fails to consider property characteristics relevant to runoff generation, such as a parcel's location in reference to storm gutters and drains and soil grade. This lack of proportionality is further demonstrated by the fact that the charge generates sufficient revenue to

allow the city to maintain a working capital reserve of 25 to 30 percent of the storm water utility's total expenses. Although maintaining a capital reserve is a common practice amongst rate-based public utilities that provides a degree of fiscal stability to utilities, those reserves are funded by true user fees closely calibrated to the actual use of the service or a price paid for a commodity. The management charge at issue in these cases in not such a fee. For these reasons, the actual use of the storm water sewer system by each parcel is not accounted for with the requisite level of precision necessary to support a conclusion that the charge is proportionate to the costs of the services provided. [*Id*. at 110-111 (citation omitted).]

This Court further concluded that the storm water charge was effectively compulsory. *Id*. at 11. Although property owners could receive credits for actions taken to reduce runoff, there was no guarantee that all property owners would receive a 100% credit. *Id*. Allowing a 100% credit for all property owners would undermine the purpose of the storm water charge, which was to generate funding for the water management system. *Id*. Also, to obtain credits, property owners must pay for improvements to their respective properties. *Id*. at 111-112. "In other words, property owners have no means by which to escape the financial demands of the ordinance." *Id*. at 112. Delinquency in payment of the charge may result in discontinuation of water service, and past-due charges could be collected through the imposition of a lien and the filing of a civil action, further demonstrating an absence of volition. *Id*. The lack of volition supported the conclusion that the storm water charge was a tax. *Id*.

The application of the *Bolt* criteria to the facts of the present case leads to the conclusion that the city of Detroit's drainage charge is a user fee rather than a tax and that the charge is therefore not subject to the Headlee Amendment. With respect to the first factor, the drainage charge serves a regulatory purpose rather than a revenue-raising purpose. Again, "a fee is exchanged for a service rendered or a benefit conferred, and some reasonable relationship exists between the amount of the fee and the value of the service or benefit. A tax, on the other hand, is designed to raise revenue." *Bolt*, 459 Mich at 161 (quotation marks and citations omitted). Here, a service is rendered in the form of removal and treatment of storm water runoff. The present case differs from *Bolt* and *Jackson Co* in that, unlike the separated storm water and sewer systems being created and maintained respectively in *Bolt* and *Jackson Co*, the city of Detroit has a combined sewer system, meaning that storm water runoff flows into the same pipes as unsanitary wastewater, i.e., sewage, and there is no plan to separate Detroit's sewer system because it would be cost prohibitive to do so. The combined sewage is treated at Detroit's WTP and CSO facilities before being released back into the environment. Federal and state regulations have required the DWSD to invest more than $1 billion in CSO control facilities in order to prevent untreated CSOs from spilling into Michigan waterways. As noted in *Detroit v Michigan*, 803 F2d 1411, 1421 (CA 6, 1986), the city of Detroit has been legally required since 1977 to render full secondary treatment to storm water flows. The DWSD has instituted the present drainage charge to pay for capital, operations, and maintenance costs for the WTP, CSO control facilities, and combined sewer system components. Therefore, unlike in *Bolt* and *Jackson Co*, in which storm water was allowed to be released back into the environment untreated, *Bolt*, 459 Mich at 167; *Jackson Co*, 302 Mich App at 106, the DWSD provides full treatment to the combined sewage comprised of storm water and unsanitary waste water, as

required by federal regulations and orders. This indicates the existence of a significant regulatory component in the present cases that was absent in *Bolt* and *Jackson Co*.

This federally mandated treatment of combined sewage that includes storm water runoff constitutes the provision of a service. This conclusion is supported by the persuasive analysis of a federal appellate court addressing Detroit's combined sewer system in the context of a claim under the Revenue Bond Act of 1933.[12] In *Detroit*, 803 F2d at 1418, the federal appellate court held that "the treatment of storm water runoff from [the Wayne County Road Commission's (WCRC)] roads within the City of Detroit constitutes a 'service rendered' within the meaning of the Michigan Revenue Bond Act of 1933." The court reasoned that a municipality has a right "to charge those who use a municipality's sewer system for the disposal or treatment of storm water runoff." *Id*. at 1419. "[A] municipality, acting pursuant to a proper delegation of authority, may charge those who use or otherwise benefit from its sewer system, even though such use or benefit is based upon the disposal or treatment of storm water running into the municipality's sewers." *Id*. at 1420. The court determined that the "WCRC receives a benefit from the disposal and treatment of the storm water running off WCRC's roads and into the City of Detroit's sewer system, and as such, we believe that this is a 'service rendered' within the meaning of the Revenue Bond Act of 1933." *Id*.

> Plainly, WCRC is benefitted by being relieved from the dangers and damages which may be occasioned by flooding from storm waters and which might, in the absence of drainage into the DWSD's sewer system, result in liability, or at least in damage to WCRC's roads. . . . Obviously, no one is responsible for this flow. The fact remains, however, that this water has to go somewhere, especially if WCRC is to keep its roads in reasonable repair and, for at least some of this water, WCRC has obtained drainage by tapping into the DWSD sewer system. [*Id*. at 1420-1421.]

The federal appellate court further reasoned:

> The storm water which constitutes the runoff from WCRC's roads may have come from God or nature in the first place, just as all water entering the DWSD's sewer system must have at one time or another. Nevertheless, the refuse or foreign matter that water accumulates as it courses through WCRC's roads must now be subjected by law to primary and secondary treatment to the extent such runoff enters Detroit's sewage treatment system. And to that extent, at least, WCRC is a user of the facility provided by DWSD. [*Id*. at 1421.]

Accordingly, the court held that "[t]he drainage and treatment of storm water from WCRC's roads into the City of Detroit's sewer system constitutes a 'service rendered' within the meaning of section 18 of the Revenue Bond Act of 1933." *Id*. (citation omitted).

---

[12] The opinions of lower federal courts are not binding but may be considered as persuasive. *Abela v Gen Motors Corp*, 469 Mich 603, 607; 677 NW2d 325 (2004).

Likewise, in the present cases, a service is provided to property owners by virtue of the drainage and treatment of storm water that enters Detroit's combined sewer system from the property owners' parcels. The regulatory weakness identified in *Bolt* and *Jackson Co* concerning the release of untreated storm water back into the environment is not present in the instant cases.

Further, there is an adequate correspondence in the present cases between the charges imposed and the benefits conferred. A lack of correspondence was found to exist in *Bolt* because approximately 75% of the property owners in the city of Lansing were already served by a separate storm and sanitary sewer system, many of those property owners had already paid special assessments to fund such separation, and yet those property owners were "charged the same amount for storm water service as the [25%] of the property owners who will enjoy the full benefits of the new construction." *Bolt*, 459 Mich at 165. No such disparity exists here. The drainage charge is not being imposed to provide a service that benefits only some property owners. Rather, the charge is used to fund capital, operations, and maintenance costs for facilities treating all of the storm water entering Detroit's combined sewage system. And for the reasons discussed below in connection with the proportionality factor, the city of Detroit's method of assessing the drainage charge assures a higher degree of precision between the service provided and the benefits conferred than did the charges at issue in *Bolt* and *Jackson Co*.[13]

Further distinguishing the present cases from *Bolt* and *Jackson Co* is the absence of any evidence of a revenue-generating purpose that outweighs the regulatory purpose of the drainage charge. "While a fee must serve a primary regulatory purpose, it can also raise money as long as it is in support of the underlying regulatory purpose." *Graham v Kochville Twp*, 236 Mich App 141, 151; 599 NW2d 793 (1999). In *Bolt*, 459 Mich at 168, our Supreme Court noted that the storm water enterprise fund replaced a portion of a program that was previously funded by general fund revenues from income and property taxes. Similarly, in *Jackson Co*, 302 Mich App at 105, the city of Jackson shifted the funding of preexisting government activities from declining general and street fund revenues to a storm water charge. This Court concluded that the revenue-raising purpose convincingly outweighed the minimal regulatory purpose of the charge. *Id*. at 106-107. The city of Jackson had admitted "that budgetary pressures, including declining general fund revenue, necessitated the tapping of new sources of funding for the maintenance of the storm water system." *Id*. at 107. No such evidence or admission exists here. There is no indication that the city of Detroit has adopted the drainage charge to fund activities previously funded by general fund revenues, let alone that any such motivation outweighs the regulatory purpose of the drainage charge.[14] Although the version of the drainage charge being challenged in these cases was adopted effective in October 2016, a drainage charge had already existed in Detroit in one form or another for many decades before that.[15] Marcus D. Hudson, the

---

[13] This Court has noted that the first two *Bolt* factors are closely related and may be analyzed together. *Graham v Kochville Twp*, 236 Mich App 141, 151; 599 NW2d 793 (1999).

[14] And the regulatory purpose here is far from minimal because, unlike in *Bolt* and *Jackson Co*, the storm water is required to be treated before being released back into the environment.

[15] DWSD customers have been paying some form of a drainage charge as part of their water and sewer bills since 1975, although it appears that a federally acceptable user charge system was not

chief financial officer of the DWSD from August 2015 to August 2017, has averred without contradiction that "[t]he [c]ity has never used general fund expenses to pay for the costs of its combined sewer system treatment and disposal services."  The DAART plaintiffs present argument essentially speculating that the drainage charge is being used to replace revenue purportedly lost as a result of the city of Detroit's bankruptcy and the formation of the GLWA, but the DAART plaintiffs have presented no evidence to support such a hypothesis. Accordingly, the lack of evidence of a significant revenue-generating purpose that outweighs the regulatory purpose leads to the conclusion that the drainage charge at issue primarily serves a regulatory purpose.

Next, the fact that the drainage charge is used in part to service debt incurred to pay for federally required capital investments does not by itself require the conclusion that the drainage charge constitutes a tax.  See *Bolt*, 459 Mich at 164-165 ("Where the charge for either storm or sanitary sewers reflects the actual costs of use, metered with relative precision in accordance with available technology, *including some capital investment component*, sewerage may properly be viewed as a utility service for which usage-based charges are permissible, and not as a disguised tax.") (emphasis added; citation omitted); *Jackson Co*, 302 Mich App at 111 (noting that "maintaining a capital reserve is a common practice among rate-based utilities that provides a degree of fiscal stability to utilities[]" but that such capital reserves must be "closely calibrated to the actual use of the service or a price paid for a commodity[]").  "[W]hile a utility fee must be reasonably proportionate to the direct and indirect costs of providing the service for which the fee is charged, mathematic precision is not required." *Trahey v City of Inskter*, 311 Mich App 582, 597; 876 NW2d 582 (2015), citing *Jackson Co*, 302 Mich App at 109.  It is also beyond question that a utility's costs may properly include a debt component.  In particular, this Court has recognized that timely payment of a water and sewer department's debt is necessary for that department's continued operation and thus constitutes part of the actual cost of providing service. *Trahey*, 311 Mich App at 597.  Further, a municipal utility's rates are presumed to be reasonable, *id*. at 594, citing *Novi v Detroit*, 433 Mich 414, 428; 446 NW2d 118 (1989), and the burden is on the plaintiff to present evidence overcoming the presumption of reasonableness, *Trahey*, 311 Mich App at 594, citing *Novi*, 433 Mich at 432-433, and *Jackson Co*, 302 Mich App at 109; see also *Wheeler*, 265 Mich App at 665-666 ("This Court presumes the amount of the fee to be reasonable, unless the contrary appears on the face of the law itself or is established by proper evidence[.]").  "Courts of law are ill-equipped to deal with the complex, technical processes required to evaluate the various cost factors and various methods of weighing those factors required in rate-making." *Novi*, 433 Mich at 430.

Plaintiffs have presented no basis to conclude that the amount of the drainage charge in the instant cases is unreasonable merely because it is used in part to service debt incurred to finance capital improvements.  It is true that in *Bolt*, our Supreme Court, in finding that the charge at issue was a tax, noted in relevant part that the charge was being used to fund "an investment in infrastructure that will substantially outlast the current 'mortgage' that the storm

in place until 1980 pursuant to a consent judgment entered as part of federal litigation regarding the Detroit sewage system.  See *Detroit*, 803 F2d at 1412-1413.

water charge requires property owners to amortize." *Bolt*, 459 Mich at 164 (citation omitted). In *Bolt*, 459 Mich at 155, 165, however, the city of Lansing was using the storm water service charge to fund the costs over 30 years of a major project that would separate the remaining portion of the city's combined sewer system and that would benefit only 25% of the property owners. Here, the city of Detroit uses the drainage charge in part to service debt incurred to finance federally mandated capital investments in the combined sewage system for the benefit of all property owners.[16] The city of Detroit's drainage charge is not used to fund future expenses for large-scale capital improvements; it is instead used to amortize present debt costs incurred to pay for capital improvements in conformance with accepted accounting principles.[17] This payment method is consistent with the "fundamental principle of basic accountancy" identified in *Bolt*, 459 Mich at 164, that "ratepayers are charged for the amortization expense when it occurs and, therefore, rates coincide with the expense and are not retroactive[,]" *id.*, quoting *Ass'n of Businesses Advocating Tariff Equity v Pub Serv Comm*, 208 Mich App 248, 261; 527 NW2d 533 (1994). It thus appears that the capital expenses here were amortized in accordance with basic accounting principles and that the drainage charge is not a means of paying future expenses required to fund large-scale infrastructure improvements.

Turning to the second *Bolt* factor, the drainage charge is reasonably proportionate to the necessary costs of service. The charge is calculated on the basis of aerial photography as well as city assessor data to determine the amount of impervious area on each parcel.[18] No drainage

---

[16] The DWSD indicated that its drainage revenue requirement would exceed $151 million for fiscal year 2017, including more than $125 million in operation and implementation costs as well as drainage credits. The DWSD's expense for debt service is $59.8 million; this expense is comprised essentially of a GLWA-held mortgage payment for facilities that are in place to address wet weather flows. The DWSD notes that "[t]his debt service expense relates to both municipal bond issues and to state revolving fund loans." In compliance with EPA regulations to prevent excessive pollution into waterways, the DWSD invested more than $1 billion in CSO control facilities. The DWSD explains: "The cost was financed almost entirely through bonds which are being repaid by the drainage fee. Direct CSO costs have two components: $25.7 million for annual CSO bond debt, and $6.2 million in annual operating costs specific to the control facilities." The DWSD expects the rate of the drainage charge to decrease by 32% through fiscal year 2019.

[17] In particular, Hudson's affidavit avers, in relevant part:

> The City's drainage fee does not pay for large-scale capital improvements in the future. Rather, the fee covers costs of debt incurred to fund these capital improvements – costs that are properly amortized in accordance with governmental accounting principles. The fee only contemplates costs for necessary repairs to maintain infrastructure (which are included among GLWA's allocated costs).

[18] The DWSD has indicated that it plans to update its 2015 aerial data with flyover imagery obtained in 2018.

charge will be imposed for parcels containing fewer than .02 impervious acres because that is the margin of error from flyover views. Further, if a property owner verifies that storm water runoff flows directly into the Detroit River or the Rouge River and that the parcel is disconnected from the DWSD system, there is no charge. The DWSD provides procedures whereby customers may dispute the measurement of the impervious acreage for a parcel or may seek an adjustment in billing on the basis of a modification to the impervious surface area or the direct discharge of surface waters to one of the above-mentioned rivers. The DWSD also permits drainage credits of up to 80% for customers who use green infrastructure systems or practices that reduce the amount of storm water flowing from the property into the DWSD's combined sewer system. The Detroit defendants have provided studies and manuals supporting the conclusion that a parcel's impervious area may be used as a way to measure or estimate the volume of storm water runoff from a parcel of property.[19] This supports the conclusion that the amount of the charge is reasonably related to the costs of regulation. This Court is not required to determine whether that relationship is mathematically precise. See *Jackson Co*, 302 Mich App at 109, citing *Graham*, 236 Mich App at 154-155. The fact that parcels discharging storm water directly to a river or containing fewer than .02 acres of impervious surface are exempt reflects that the city has undertaken reasonable efforts to ensure that only parcels which discharge water into the combined sewer system are subject to the charge. Moreover, the individual measurements that are taken of each parcel further distinguishes the instant cases from *Bolt* and *Jackson Co*, in which flat rates were used for residential parcels of two acres or less. See *Bolt*, 459 Mich at 156; *Jackson Co*, 302 Mich App at 96. Also, Hudson's affidavit states that for the fiscal year ending on June 30, 2016, the cash on hand was 5.4% of total receipts, which constituted approximately 115 days of operating expenses, less than the industry standard of 250 days.[20] This indicates that the city was not collecting more than it needed to operate the system.

The DAART plaintiffs and amici curiae suggest that the drainage charge is disproportionate because of the gradual phase-in of the new charge for various customers over five years. The DAART plaintiffs and amici curiae fail to establish that the use of a phase-in period, which is by definition temporary, is pertinent to determining the overall essence or character of a charge as a user fee or a tax. In an affidavit, Palencia Mobley, PE, the DWSD's deputy director and chief engineer, explained the rationale for the phase-in period as follows:

> 5. DWSD ultimately decided to phase-in the uniform drainage rate as a way to mitigate the rate shock that was being experienced by all customers transitioning to the impervious acreage rate. Rate shock occurs when a customer experiences a rate increase that is much higher than the customer's previous rate.

---

[19] In addition, federal regulations permit the consideration of a user's land area as a means to distribute costs in the context of a user charge system. See 40 CFR 35.2140(e)(2)(*ii*).

[20] Hudson explained that cash on hand is critical to address unforeseen events such as "emergencies, unexpected drops in demand, seasonal expenditures (e.g. building cash in the winter to pay for large summer costs), and settlement of potential legal claims like flood claims." It also is essential "to improving the City's borrowing rate, since all of the ratings agencies consider cash-on-hand as a bellwether for organizational health."

Rate shock can lead to customers not paying their bills (which causes an increase in future bad debt expense).

6. For example, before DWSD decided to phase-in the drainage rate for new-to-world customers, 59.4% of its billings to these customers for the full amount of the drainage rate remained outstanding. After the implementation of the phase-in, the total percentage of outstanding billings decreased to 9.2%.

Indeed, it is well understood in the context of utility ratemaking that a phase-in period is a permissible administrative mechanism to ensure a gradual and orderly transition to a uniform rate in order to avoid rate shock. See, e.g., *Citizens Action Coalition of Indiana, Inc v Northern Indiana Pub Serv Co*, 76 NE3d 144, 153 (Ind App, 2017) (referring to the use of "gradualism" to "moderate any rate shock") (quotation marks and citation omitted);[21] *Watergate East, Inc v Pub Serv Comm of Dist of Columbia*, 665 A2d 943, 949 (DC, 1995) (describing a "policy of gradualism in the setting of utility rates, which dictates that utility customers generally should not be subjected to dramatic fluctuations in their rate payments[]"). Great deference is owed to the exercise of legislatively authorized ratemaking authority by municipal utility entities such as the DWSD. See *Novi*, 433 Mich at 425-426, 428, 430. The DAART plaintiffs and amici curiae have failed to establish that the phase-in period adopted here falls outside the DWSD's ratemaking authority or affects the overall character of the drainage charge.

Further, the drainage charge is not rendered disproportionate by the DWSD's failure to charge the city of Detroit itself a drainage fee for storm water flowing from city streets into the combined sewer system. Plaintiffs have presented no evidence to dispute the DWSD's explanation that "[c]ity streets, which are lower than parcels, are part of the conveyance infrastructure for facilitating the flow of storm water from Detroit properties into the catch basins, then into the combined sewer system, and then finally terminating at the [WTP]." See *Detroit*, 803 F2d at 1416 (the city of Detroit's failure to charge itself a drainage fee was not relevant to the city's claim against the WCRC for treatment of storm water running off the WCRC's roads within the city). Further, it is notable that city-owned parcels, as opposed to city streets, are not characterized by the DWSD as part of the conveyance infrastructure. Overall, the drainage charge is reasonably proportionate to the necessary costs of service.

Turning to the third factor, the drainage charge in the instant cases is effectively compulsory rather than voluntary. Property owners who have .02 or more impervious acres and whose storm water does not discharge directly into a river have essentially no control over whether to use the drainage service and pay the drainage charge. Although a green infrastructure credit system is available, it permits a credit only of up to 80% of the drainage charge. See *Jackson Co*, 302 Mich App at 111 (noting that the city of Jackson's credit system did not guarantee property owners would receive a 100% credit and finding the city's charge effectively compulsory). Moreover, property owners must either pay the drainage charge or pay at least

---

[21] Although not binding on this Court, the decisions of the courts of other states may be considered persuasive. See *K & K Constr, Inc v Dep't of Environmental Quality*, 267 Mich App 523, 559 n 38; 705 NW2d 365 (2005).

some of the costs for making the green infrastructure improvements required to obtain a credit, thus making it impossible for property owners to escape the financial demands of the drainage charge. See *id*. at 111-112 (noting that property owners could not escape the financial demands of the city of Jackson ordinance because the property owners must either pay the charges assessed or pay for improvements to their respective properties). Although property owners are free to reduce the impervious areas on their properties, this is not "a legitimate method for controlling the amount of the fee because it is tantamount to requiring property owners to relinquish their rights of ownership to their property by declining to build on the property." *Bolt*, 459 Mich at 168. It is also notable that if a customer refuses to pay the drainage charge, the DWSD may terminate water service for the property, impose a lien on the property, commence a legal action to recover unpaid fees, and suspend or revoke a license to do business in the city of Detroit, which further indicates the effectively compulsory nature of the drainage charge. See *Jackson Co*, 302 Mich App at 112 (stating that the compulsory nature of the charge was demonstrated in part by the fact that delinquent payments could result in the discontinuation of water service, the imposition of a lien, and the filing of a civil action to collect past-due charges).

Overall, we determine that the application of the *Bolt* factors leads to the conclusion that the drainage charge in the present cases is a permissible user fee rather than a tax. The *Bolt* "criteria are not to be considered in isolation, but rather in their totality, such that a weakness in one area would not necessarily mandate a finding that the charge is not a fee." *Wheeler*, 265 Mich App at 665 (quotation marks and citation omitted). As discussed, the first two *Bolt* factors indicate that the drainage charge is a user fee because it serves a regulatory purpose and is proportionate to the necessary costs of the service. See *Bolt*, 459 Mich at 161-162. Although our analysis under the third *Bolt* factor indicates that the drainage charge is effectively compulsory rather than voluntary, "the lack of volition does not render a charge a tax, particularly where the other criteria indicate the challenged charge is a user fee and not a tax." *Wheeler*, 265 Mich App at 666. Because the application of the first two *Bolt* criteria clearly demonstrates that the drainage charge is a proper user fee rather than a tax, the effectively compulsory nature of the drainage charge does not render the drainage charge a tax for the purpose of the Headlee Amendment. See *id*. at 667. Therefore, the drainage charge is a permissible user fee that is not subject to the Headlee Amendment.[22]

---

[22] The DAART plaintiffs' discussion in their supplemental brief criticizing a settlement agreement reached in another Headlee Amendment lawsuit challenging the city of Detroit's drainage charge, *Mich Warehousing Group, LLC v Detroit*, Wayne Circuit Court Case No. 15-010165-CZ, has no relevance to the determination whether the drainage charge is a user fee or a tax. Moreover, the present cases are original actions and not appeals from any order issued in *Mich Warehousing*. The DAART plaintiffs may not use their original action here to collaterally attack any order entered in a separate case. See *People v Howard*, 212 Mich App 366, 369; 538 NW2d 44 (1995) ("[A] collateral attack occurs whenever a challenge is made to a judgment in any manner other than through a direct appeal."); *SS Aircraft Co v Piper Aircraft Corp*, 159 Mich App 389, 393; 406 NW2d 304 (1987) ("The decision of a court having jurisdiction is final when not appealed and cannot be collaterally attacked.").

Given our resolution of the above issue, we need not address the other issues raised and discussed in the parties' original and supplemental briefs.

For the foregoing reasons, we deny plaintiffs' requests for relief. MCR 7.206(E)(3)(b).[23]


/s/ Michael J. Riordan
/s/ William B. Murphy
/s/ Mark T. Boonstra

---

[23] In light of our decision to deny plaintiffs' requests for relief, plaintiffs' respective motions for class certification are denied because plaintiffs lack a cause of action. See *Zine v Chrysler Corp*, 236 Mich App 261, 287; 600 NW2d 384 (1999) (holding that "[a] plaintiff who cannot maintain the cause of action as an individual is not qualified to represent the proposed class[]" and that because the plaintiff in *Zine* lacked a cause of action, he could not serve as a representative of the proposed class, making it proper to deny his motion for class certification on that basis alone), citing *McGill v Auto Ass'n of Mich*, 207 Mich App 402, 408; 526 NW2d 12 (1994) (finding no error in the refusal to certify the plaintiffs' proposed class and explaining that "[b]ecause plaintiffs cannot maintain their individual causes of action, they are unqualified to represent the purported class[]"). The Detroit defendants' motions seeking an extension of the due dates for responding to plaintiffs' respective motions for class certification are denied as moot. See generally, *B P 7 v Bureau of State Lottery*, 231 Mich App 356, 359; 586 NW2d 117 (1998).

Further, the Binns plaintiffs' request for entry of default against the GLWA is denied because the request is not properly supported by an affidavit or otherwise. The "default request, affidavit, and entry" form filed by the Binns plaintiffs contained the signature of the Binns plaintiffs' attorney in the "request and affidavit" section of the form, but the document was not notarized, the Binns plaintiffs offered no other support for their request, and no default has been entered by the Clerk of this Court in the "default entry" section of the form. See MCR 2.603(A)(1) ("If a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules, and that fact is made to appear *by affidavit or otherwise*, the clerk must enter the default of that party.") (emphasis added); *Sherry v East Suburban Football League*, 292 Mich App 23, 31; 807 NW2d 859 (2011) ("[A]n affidavit lacking notarization is invalid[.]"), citing *Detroit Leasing Co v Detroit*, 269 Mich App 233, 236; 713 NW2d 269 (2005) ("[A] document that is not notarized is not a 'valid affidavit.' "). Finally, the GLWA's motion to strike or set aside the Binns plaintiffs' request for default and for leave to answer or otherwise respond is denied as moot. See generally, *B P 7*, 231 Mich App at 359.